UNITED STATES *v.* RODGERS ET AL.

No. 81–1476. Argued December 6, 1982—Decided May 31, 1983*

---

*Together with *United States* v. *Ingram et al.*, also on certiorari to the same court (see this Court's Rule 19.4).

BRENNAN, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, MARSHALL, and POWELL, JJ., joined. BLACKMUN, J., filed an opinion concurring in the result in part and dissenting in part, in which REHNQUIST, STEVENS, and O'CONNOR, JJ., joined, *post*, p. 713.

*George W. Jones* argued the cause *pro hac vice* for the United States. On the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Stuart A. Smith, William S. Estabrook*, and *Wynette J. Hewett*.

*Wm. D. Elliott* argued the cause for respondents Rodgers et al. With him on the brief was *J. Michael Wylie*. *L. Lynn Elliott* argued the cause and filed a brief for respondents Ingram et al.

JUSTICE BRENNAN delivered the opinion of the Court.

These consolidated cases involve the relationship between the imperatives of federal tax collection and rights accorded by state property laws. Section 7403 of the Internal Revenue Code of 1954, 26 U. S. C. § 7403 (1976 ed. and Supp. V), authorizes the judicial sale of certain properties to satisfy the tax indebtedness of delinquent taxpayers. The issue in both cases is whether § 7403 empowers a federal district court to order the sale of a family home in which a delinquent taxpayer had an interest at the time he incurred his indebtedness, but in which the taxpayer's spouse, who does not owe any of that indebtedness, also has a separate "homestead" right as defined by Texas law. We hold that the statute does grant power to order the sale, but that its exercise is limited to some degree by equitable discretion. We also hold that, if the home *is* sold, the nondelinquent spouse is entitled, as part of the distribution of proceeds required under § 7403, to so much of the proceeds as represents complete compensation for the loss of the homestead estate.

I

A

Section 7403 provides in full as follows:

"(a) Filing.—In any case where there has been a refusal or neglect to pay any tax, or to discharge any liability in respect thereof, whether or not levy has been made, the Attorney General or his delegate, at the request of the Secretary [of the Treasury], may direct a civil action to be filed in a district court of the United States to enforce the lien of the United States under this title with respect to such tax or liability or to subject any

property, of whatever nature, of the delinquent, or in which he has any right, title, or interest, to the payment of such tax or liability. For purposes of the preceding sentence, any acceleration of payment under section 6166(g) shall be treated as a neglect to pay tax.

"(b) Parties.—All persons having liens upon or claiming any interest in the property involved in such action shall be made parties thereto.

"(c) Adjudication and decree.—The court shall, after the parties have been duly notified of the action, proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property, by the proper officer of the court, and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States. If the property is sold to satisfy a first lien held by the United States, the United States may bid at the sale such sum, not exceeding the amount of such lien with expenses of sale, as the Secretary directs.

"(d) Receivership.—In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

As a general matter,[1] the "lien of the United States" referred to in § 7403(a) is that created by 26 U. S. C. § 6321, which provides:

"If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount (including any

---

[1] See also 26 U. S. C. § 5004 (1976 ed. and Supp. V) (lien in case of tax on distilled spirits); § 6324 (special liens for estate and gift taxes).

interest, additional amount, addition to tax, or assessable penalty, together with any costs that may accrue in addition thereto) shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."[2]

Section 7403, whose basic elements go back to revenue legislation passed in 1868 (§ 106 of the Act of July 20, 1868, ch. 186, 15 Stat. 167) is one of a number of distinct enforcement tools available to the United States for the collection of delinquent taxes.[3] The Government may, for example, simply sue for the unpaid amount, and, on getting a judgment, exercise the usual rights of a judgment creditor. See 26 U. S. C. §§ 6502(a), 7401, 7402(a). Yet a third route is administrative levy under 26 U. S. C. § 6331(a), which provides:

"If any person liable to pay any tax neglects or refuses to pay the same within 10 days after notice and demand, it shall be lawful for the Secretary [or his delegate] to collect such tax (and such further sum as shall be sufficient to cover the expenses of the levy) by levy upon all property and rights to property (except such property as is exempt under section 6334) belonging to such person or on which there is a lien provided in this chapter for the payment of such tax . . . ."

Administrative levy, unlike an ordinary lawsuit, and unlike the procedure described in § 7403, does not require any judicial intervention, and it is up to the taxpayer, if he so

---

[2] The validity and priority of a § 6321 lien as against certain third parties with subsequently arising interests in the property or interests in property to which the lien has attached are governed by 26 U. S. C. § 6323 (1976 ed. and Supp. V). See also 26 U. S. C. § 6322 (period of lien); 26 U. S. C. § 6325 (1976 ed. and Supp. V) (release of lien or discharge of property).

[3] See generally 4 B. Bittker, Federal Taxation of Income, Estates, and Gifts ¶ 111.5 (1981) (hereinafter Bittker); McGregor & Davenport, Collection of Delinquent Federal Taxes, Twenty-Eighth Inst. on Fed. Tax. 589 (1976).

chooses, to go to court if he claims that the assessed amount was not legally owing. See generally *Bull* v. *United States*, 295 U. S. 247, 260 (1935).[4]

The common purpose of this formidable arsenal of collection tools is to ensure the prompt and certain enforcement of the tax laws in a system relying primarily on self-reporting. See *G. M. Leasing Corp.* v. *United States*, 429 U. S. 338, 350 (1977); *United States* v. *Security Trust & Savings Bank*, 340 U. S. 47, 51 (1950); *Bull* v. *United States, supra*, at 259–260.[5] Moreover, it has long been an axiom of our tax collection scheme that, although the definition of underlying property interests is left to state law, the consequences that attach to those interests is a matter left to federal law. See *United States* v. *Mitchell*, 403 U. S. 190, 205 (1971) (state law determines income attributable to wife as community property, but state law allowing wife to renounce community rights and obligations not effective as to liability for federal tax); *United States* v. *Union Central Life Insurance Co.*, 368 U. S. 291, 293–295 (1961) (federal tax lien not subject, even as against good-faith purchaser, to state filing requirements); *Aquilino* v. *United States*, 363 U. S. 509, 513–515 (1960), and cases cited (attachment of federal lien depends on whether "property" or "rights to property" exist under state law; priority of federal lien depends on federal law); *United States* v. *Bess*, 357 U. S. 51, 56–57 (1958) (once it has been determined that state law has created property interests sufficient for federal tax lien to attach, state law "is inoperative to prevent the attachment" of such liens); *Springer* v. *United States*, 102 U. S. 586, 594 (1881) (federal tax sale not subject to state requirement that independent lots be sold separately).

---

[4] But cf. 26 U. S. C. § 6213 (1976 ed. and Supp. V) (relating to unpaid taxes attributable to a deficiency).

[5] See also *United States* v. *Bisceglia*, 420 U. S. 141, 145–146 (1975) (26 U. S. C. §§ 7601, 7602); *United States* v. *American Friends Service Committee*, 419 U. S. 7, 12 (1974) (Anti-Injunction Act, 26 U. S. C. § 7421).

## B

The substance of Texas law related to the homestead right may usefully be divided into two categories. Cf. *Woods* v. *Alvarado State Bank*, 118 Tex. 586, 590, 19 S. W. 2d 35, 35 (1929). First, in common with a large number of States, Texas establishes the family home or place of business[6] as an enclave exempted from the reach of most creditors. Thus, under Tex. Const., Art. 16, § 50:

> "The homestead of a family, or of a single adult person, shall be, and is hereby protected from forced sale, for the payment of all debts except for [certain exceptions not relevant here] . . . . No mortgage, trust deed, or other lien on the homestead shall ever be valid, except for [certain exceptions not relevant here]."[7]

Second, in common with a somewhat smaller number of States, Texas gives members of the family unit additional rights in the homestead property itself. Thus, in a clause not included in the above quotation, Tex. Const., Art 16, § 50, also provides that "the owner or claimant of the prop-

---

[6] Texas Const., Art. 16, § 51, provides in relevant part:

"[T]he homestead in a city, town or village, shall consist of lot, or lots, not to exceed in value Ten Thousand Dollars ['Five Thousand Dollars' before 1970], at the time of their designation as the homestead, without reference to the value of any improvements thereon; provided that the same shall be used for the purposes of a home, or as a place to exercise the calling or business of the homestead claimant, whether a single adult person, or the head of a family."

See also Tex. Rev. Civ. Stat. Ann., Art. 3833 (Vernon Supp. 1982–1983). No claim seems to be made in these cases that the properties involved are not homesteads by virtue of having exceeded, at the time of designation, the monetary limit set out in the statute.

[7] See also Tex. Rev. Civ. Stat. Ann., Art. 3834 (Vernon 1966) (proceeds of voluntary sale of homestead not subject to garnishment or forced sale within six months after such sale); *Ingram* v. *Dallas Dept. of Housing & Urban Rehabilitation*, 649 F. 2d 1128, 1132, n. 6 (CA5 1981) (citing cases applying same rule to fire insurance proceeds).

erty claimed as homestead [may not], if married, sell or aban-
don the homestead without the consent of the other spouse,
given in such manner as may be prescribed by law."[8] Equally
important, Art. 16, § 52, provides:

> "On the death of the husband or wife, or both, the home-
> stead shall descend and vest in like manner as other real
> property of the deceased, and shall be governed by the
> same laws of descent and distribution, but it shall not be
> partitioned among the heirs of the deceased during the
> lifetime of the surviving husband or wife, or so long as
> the survivor may elect to use or occupy the same as a
> homestead, or so long as the guardian of the minor chil-
> dren of the deceased may be permitted, under the order
> of the proper court having the jurisdiction, to use and
> occupy the same."[9]

The effect of these provisions in the Texas Constitution is
to give each spouse in a marriage a separate and undivided
possessory interest in the homestead, which is only lost by
death or abandonment, and which may not be compromised
either by the other spouse or by his or her heirs.[10] It bears
emphasis that the rights accorded by the homestead laws
vest independently in each spouse regardless of whether one
spouse, or both, actually owns the fee interest in the home-
stead. Thus, although analogy is somewhat hazardous in

---

[8] See also Tex. Fam. Code Ann. §§ 5.81–5.86 (1975).

[9] See also Tex. Prob. Code Ann. §§ 283–285 (1980).

[10] The homestead character of property is not destroyed even by divorce,
if one of the parties to the divorce continues to maintain the property as a
proper homestead. See *Renaldo* v. *Bank of San Antonio*, 630 S. W. 2d
638, 639 (Tex. 1982); *Wierzchula* v. *Wierzchula*, 623 S. W. 2d 730, 732
(Tex. Civ. App. 1981). The courts may, however, partition the property,
award it to one or the other spouse, or require one spouse to compensate
the other, as part of the disposition of marital property attendant to the
divorce proceedings. See *Hedtke* v. *Hedtke*, 112 Tex. 404, 248 S. W. 21
(1923); *Brunell* v. *Brunell*, 494 S. W. 2d 621, 622–623 (Tex. Civ. App.
1973).

this area, it may be said that the homestead laws have the effect of reducing the underlying ownership rights in a homestead property to something akin to remainder interests and vesting in each spouse an interest akin to an undivided life estate in the property. See *Williams* v. *Williams*, 569 S. W. 2d 867, 869 (Tex. 1978), and cases cited; *Paddock* v. *Siemoneit*, 147 Tex. 571, 585, 218 S. W. 2d 428, 436 (1949), and cases cited; *Hill* v. *Hill*, 623 S. W. 2d 779, 780 (Tex. App. 1981), and cases cited. This analogy, although it does some injustice to the nuances present in the Texas homestead statute,[11] also serves to bring to the fore something that has been repeatedly emphasized by the Texas courts, and that was reaffirmed by the Court of Appeals in these cases: that the Texas homestead right is not a mere statutory entitlement, but a vested property right. As the Supreme Court of Texas has put it, a spouse "has a vested estate in the land of which she cannot be divested during her life except by abandonment or a voluntary conveyance in the manner prescribed by law." *Paddock* v. *Siemoneit, supra,* at 585, 218 S. W. 2d, at 436; see *United States* v. *Rogers*, 649 F. 2d 1117, 1127 (CA5 1981), and cases cited.[12]

## II

The two cases before us were consolidated for oral argument before the United States Court of Appeals for the Fifth Circuit, and resulted in opinions issued on the same day. *United States* v. *Rogers, supra;*[13] *Ingram* v. *Dallas Dept. of*

---

[11] See *Fiew* v. *Qualtrough*, 624 S. W. 2d 335, 337 (Tex. App. 1981) (homestead estate, because it can be lost through abandonment, is not identical to life estate; it nevertheless " 'partakes of the nature of an estate for life' ") (emphasis deleted).

[12] Moreover, a homestead estate is treated in Texas as property for which just compensation or its equivalent must be paid in case of condemnation by the State. *Lucas* v. *Lucas*, 104 Tex. 636, 143 S. W. 1153 (1912). Cf. *infra,* at 697–698.

[13] Mrs. Rodgers' name was misspelled in the complaint filed by the Government. See 649 F. 2d, at 1119, n. 1.

*Housing & Urban Rehabilitation*, 649 F. 2d 1128 (1981). They arise out of legally comparable, but quite distinct, sets of facts.

### A

Lucille Mitzi Bosco Rodgers is the widow of Philip S. Bosco, whom she married in 1937. She and Mr. Bosco acquired, as community property, a residence in Dallas, Texas, and occupied it as their homestead. Subsequently, in 1971 and 1972, the Internal Revenue Service issued assessments totaling more than $900,000 for federal wagering taxes, penalties, and interest, against Philip for the taxable years 1966 through 1971. These taxes remained unpaid at the time of Philip's death in 1974. Since Philip's death, Lucille has continued to occupy the property as her homestead, and now lives there with her present husband.

On September 23, 1977, the Government filed suit under 26 U. S. C. §§ 7402 and 7403 in the United States District Court for the Northern District of Texas against Mrs. Rodgers and Philip's son, daughter, and executor. The suit sought to reduce to judgment the assessments against Philip, to enforce the Government's tax liens, including the one that had attached to Philip's interest in the residence, and to obtain a deficiency judgment in the amount of any unsatisfied part of the liability. On cross-motions for summary judgment, the District Court granted partial summary judgment on, among other things, the defendants' claim that the federal tax liens could not defeat Mrs. Rodgers' state-created right not to have her homestead subjected to a forced sale. Fed. Rule Civ. Proc. 54(b).

The Court of Appeals affirmed on the homestead issue,[14] holding that if "a homestead interest is, under state law, a property right, possessed by the nontaxpayer spouse at the time the lien attaches to the taxpayer spouse's interest, then the federal tax lien may not be foreclosed against the home-

---

[14] It reversed on an attorney's fees issue not now before us.

stead property for as long as the nontaxpayer spouse maintains his or her homestead interest under state law." 649 F. 2d, at 1125 (footnotes omitted). The court implied that the Government had the choice of either waiting until Mrs. Rodgers' homestead interest lapsed, or satisfying itself with a forced sale of only Philip Bosco's interest in the property.

## B

Joerene Ingram is the divorced wife of Donald Ingram. During their marriage, Joerene and Donald acquired, as community property, a residence in Dallas, Texas, and occupied it as their homestead. Subsequently, in 1972 and 1973, the Internal Revenue Service issued assessments against Donald Ingram relating to unpaid taxes withheld from wages of employees of a company of which he was president. Deducting payments made on account of these liabilities, there remains unpaid approximately $9,000, plus interest. In addition, in 1973, the Service made an assessment against both Donald and Joerene in the amount of $283.33, plus interest, relating to their joint income tax liability for 1971. These amounts also remain unpaid.

In March 1975, at about the time the Ingrams were seeking a divorce, their residence was destroyed by fire. In September 1975, the Ingrams obtained a divorce. In connection with the divorce, they entered into a property settlement agreement, one provision of which was that Donald would convey to Joerene his interest in the real property involved in this case in exchange for $1,500, to be paid from the proceeds of the sale of the property. Joerene tried to sell the property, through a trustee, but was unsuccessful in those efforts, apparently because of the federal tax liens encumbering the property. To make matters worse, she then received notice from the City of Dallas Department of Housing and Urban Rehabilitation (Department) that unless she complied with local ordinances, the remains of the fire-

damaged residence would be demolished. Following a hearing, the Department issued a final notice and a work order to demolish. Joerene Ingram and the trustee then filed suit in Texas state court to quiet title to the property, to remove the federal tax liens, and to enjoin demolition. The defendants were the United States, the Department, and several creditors claiming an interest in the property.

The United States removed the suit to the District Court for the Northern District of Texas. It then filed a counterclaim against Joerene Ingram and Donald Ingram (who was added as a defendant on the counterclaim) for both the unpaid withholding taxes and the joint liability for unpaid income taxes. In its prayer for relief, the Government sought, among other things, judicial sale of the property under § 7403. Pursuant to a stipulation of the parties, the property was sold unencumbered and the proceeds (approximately $16,250) were deposited into the registry of the District Court pending the outcome of the suit. The parties agreed that their rights, claims, and priorities would be determined as if the sale had not taken place, and that the proceeds would be divided according to their respective interests. On cross-motions for summary judgment, the District Court granted summary judgment on the Government's counterclaims.

The Court of Appeals affirmed in part, and reversed and remanded in part. It agreed that the Government could foreclose its lien on the proceeds from the sale of the property to collect the $283.33, plus interest, for the unpaid income tax owed by Joerene and Donald Ingram jointly. Applying its decision in *Rodgers*, however, it also held that the Government could not reach the proceeds of the sale of the property to collect the individual liability of Donald Ingram, assuming Joerene Ingram had maintained her homestead interest in the property. The court remanded, however, for a factual determination of whether Joerene had "abandoned" the

homestead by dividing the insurance proceeds with Donald and by attempting—even before the stipulation entered into with the Government—to sell the property and divide the proceeds of that sale with Donald.[15]

## C

The Government filed a single petition for certiorari in both these cases. See this Court's Rule 19.4. We granted certiorari, 456 U. S. 904 (1982), in order to resolve a conflict among the Courts of Appeals as to the proper interpretation of § 7403.

## III

### A

The basic holding underlying the Court of Appeals' view that the Government was not authorized to seek a sale of the homes in which respondents held a homestead interest is that "when a delinquent taxpayer shares his ownership interest in property jointly with other persons rather than being the sole owner, his 'property' and 'rights to property' to which the federal tax lien attaches under 26 U. S. C. § 6321, and on which federal levy may be had under 26 U. S. C. § 7403(a), involve only his *interest* in the property, and not the entire property." 649 F. 2d, at 1125 (emphasis in original). According to the Court of Appeals, this principle applies, not only in the homestead context, but in any cotenancy in which unindebted third parties share an ownership interest with a delinquent taxpayer. See *Folsom* v. *United States*, 306 F. 2d 361 (CA5 1962).

We agree with the Court of Appeals that the Government's lien under § 6321 cannot extend beyond the property inter-

---

[15] The Court of Appeals did suggest that neither the fire nor the intention to sell the house would, in and of themselves, necessarily indicate an abandonment of the homestead. 649 F. 2d, at 1132, and n. 6; see n. 7, *supra.*

ests held by the delinquent taxpayer.[16] We also agree that the Government may not ultimately collect, as satisfaction for the indebtedness owed to it, more than the value of the property interests that are actually liable for that debt. But, in this context at least, the right to collect and the right to seek a forced sale are two quite different things.

The Court of Appeals for the Fifth Circuit recognized that it was the only Court of Appeals that had adopted the view that the Government could seek the sale, under § 7403, of only the delinquent taxpayer's *"interest* in the property, and not the entire property." 649 F. 2d, at 1125, and n. 12. We agree with the prevailing view that such a restrictive reading of § 7403 flies in the face of the plain meaning of the statute. See, *e. g., United States* v. *Trilling,* 328 F. 2d 699, 702–703 (CA7 1964); *Washington* v. *United States,* 402 F. 2d 3, 6–7 (CA4 1968); *United States* v. *Overman,* 424 F. 2d 1142, 1146 (CA9 1970); *United States* v. *Kocher,* 468 F. 2d 503, 506–507 (CA2 1972); see also *Mansfield* v. *Excelsior Refining Co.,* 135 U. S. 326, 339–341 (1890).[17]

---

[16] Accord, *In re Carlson,* 580 F. 2d 1365, 1369 (CA10 1978); *Herndon* v. *United States,* 501 F. 2d 1219 (CA8 1974); *Economy Plumbing & Heating Co.* v. *United States,* 197 Ct. Cl. 839, 843, 456 F. 2d 713, 716 (1972); *United States* v. *Overman,* 424 F. 2d 1142, 1146 (CA9 1970); see *United States* v. *Bess,* 357 U. S. 51, 55–57 (1958); Bittker ¶ 111.5.4, at 111–102 ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out").

Of course, once a lien has attached to an interest in property, the lien cannot be extinguished (assuming proper filing and the like) simply by a transfer or conveyance of the interest. See generally 26 U. S. C. § 6323 (1976 ed. and Supp. V); *United States* v. *Bess, supra,* at 57. Thus, in these cases, liens still attach to the specific property interests transferred by Philip Bosco at his death, and conveyed by Donald Ingram as part of his divorce settlement with Joerene Ingram.

[17] In *Mansfield,* this Court held that the federal tax collector could not, by a sale pursuant to administrative levy, pass good title to property leased by a tax-delinquent distiller but owned by a third party, even though the third-party owner had previously signed a waiver giving the Government a first lien on the fee interest. "Any other construction would impute to

Section 7403(a) provides, not only that the Government may "enforce [its] lien," but also that it may seek to "subject *any property*, of whatever nature, of the delinquent, or *in which he has any right, title, or interest*, to the payment of such tax or liability" (emphasis added). This clause in and of itself defeats the reading proposed by the Court of Appeals.[18]

---

Congress the purpose, in order that the taxes against the delinquent distiller, having only a leasehold interest, might be collected, to seize and sell the interest of the owner of the fee, and to destroy the lien of an incumbrancer, without giving either an opportunity to be heard." 135 U. S., at 340. Cf. *infra*, at 695–696. The Court also noted, however, that

"[i]n order to collect the taxes due from . . . the distiller, [the Government] might have instituted a suit in equity [under the predecessor statute to § 7403], to which not only the distiller, who had simply a leasehold interest, but *all persons* having liens upon, or claiming any interest in, the premises could be made parties; in which suit, it would have been the duty of the court to determine finally the merits of *all claims* to and liens upon the property, and to order a sale distributing the proceeds among the parties according to their respective interests." 135 U. S., at 339 (emphasis added).

Read broadly, *Mansfield* is on "all fours" with our holding today. Read more narrowly, it may be dependent on the fact of the waiver signed by the fee owners. See *id.*, at 339–340. The former reading is more plausible, but we do not rest our decision on it.

In denying even an ambiguity in *Mansfield, post*, at 721–722, the dissent in our view makes two errors. First, it pays insufficient attention to the general statement quoted above. Second, it ignores the full context of the language upon which it does rely. In context, that language suggests to us that the waiver obtained by the Government gave it, not the right to seek a sale of the entire property, but the right, *if* it sought a sale of the entire property, to gain access to the entire proceeds of the sale rather than merely the value of the leasehold interest once held by the taxpayer.

[18] The statutory language does pose one difficulty, not discussed or relied on by the Court of Appeals: It might be possible to read the phrase "to enforce the lien of the United States under this title . . . *or* to subject any property, of whatever nature, of the delinquent, or in which he *has* any right, title, or interest, to the payment of such tax or liability" (emphasis added), as suggesting that if a lien has attached to a delinquent taxpayer's interest in property, but the delinquent taxpayer has no *current* interest in that property, then the Government would have no power to seek the sale

Section 7403(b) then provides that "[a]ll persons having liens upon *or claiming any interest in the property involved in such action* shall be made parties thereto" (emphasis added). Obviously, no joinder of persons claiming independent interests in the property would be necessary if the Government were only authorized to seek the sale of the delinquent taxpayer's own interests. Finally, § 7403(c) provides that the district court should "determine the merits of *all* claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale *of such property . . . and a distribution of the proceeds of such sale according to the findings of the court in respect to the interests of the parties and of the United States*" (emphasis added). Again, we must read the statute

of the entire property. This reading is plausible on its face, but there is no indication that Congress intended such a bifurcation, and there are no cases of which we are aware that support it. Cf. Bittker ¶ 111.5.5, at 111–107; see generally n. 16, *supra*. Moreover, the remainder of § 7403 does not appear to recognize such a distinction.

Drawing such a distinction would also make little sense as a policy matter. A third party holding a property interest to which no lien has attached has the same interests vis-à-vis the Government regardless of whether the concurrent property interest to which a lien *has* attached is still in the hands of the delinquent taxpayer, or has been conveyed to someone else.

Even if we were to adopt such an unprecedented reading of the statute, it might well make no difference in these cases. By virtue of 26 U. S. C. § 6901(a), § 7403(a) should actually be read to the effect that the Government may seek "to subject any property, of whatever nature, of the delinquent *or his liable transferee*, or in which he *or his liable transferee* has any right, title, or interest, to the payment of such tax or liability." See generally *Phillips* v. *Commissioner*, 283 U. S. 589 (1931); *Commissioner* v. *Stern*, 357 U. S. 39 (1958). Whether the present holders of the property interests to which tax liens have attached are liable transferees under § 6901(a) is determined by state law, see *Stern, supra*, at 42–45, but we do note that (1) Philip Bosco's interests seem now to be held by his estate or heirs, and (2) there may be some question as to whether the conveyance of Donald Ingram's interest to Joerene Ingram was for full value. See generally Bittker ¶ 111.5.7.

to contemplate, not merely the sale of the delinquent tax-payer's own interest, but the sale of the entire property (as long as the United States has any "claim or interest" in it), and the recognition of third-party interests through the mechanism of judicial valuation and distribution.

Our reading of § 7403 is consistent with the policy inherent in the tax statutes in favor of the prompt and certain collection of delinquent taxes. See *supra*, at 683. It requires no citation to point out that interests in property, when sold separately, may be worth either significantly *more* or significantly *less* than the sum of their parts. When the latter is the case, it makes considerable sense to allow the Government to seek the sale of the whole, and obtain its fair share of the proceeds, rather than satisfy itself with a mere sale of the part.

Our reading is also supported by an examination of the historical background against which the predecessor statute to § 7403 was enacted. In 1868, as today, state taxation consisted in large part of ad valorem taxation on real property. In enforcing such taxes against delinquent taxpayers, one usual remedy was a sale by the State of the assessed property. The prevailing—although admittedly not universal—view was that such sales were *in rem* proceedings, and that the title that was created in the sale extinguished not only the interests of the person liable to pay the tax, but also any other interests that had attached to the property, even if the owners of such interests could not otherwise be held liable for the tax. See generally H. Black, Law of Tax Titles §§ 231–236 (1888); W. Burroughs, Law of Taxation § 122 (1877). Where *in rem* proceedings were the rule, they were generally held to cut off as well dower or homestead rights possessed by the delinquent taxpayer's spouse. See *Lucas* v. *Purdy*, 142 Iowa 359, 120 N. W. 1063 (1909); *Robbins* v. *Barron*, 32 Mich. 36 (1875); *Jones* v. *Devore*, 8 Ohio St. 430 (1858); Black 299; Burroughs 348. But cf. R. Blackwell, Power to Sell Land for the Non-Payment of Taxes 550 (3d ed. 1869).

One evident purpose of the federal judicial sale provision enacted in 1868 was to obtain for the federal tax collector some of the advantages that many States enjoyed through *in rem* tax enforcement. As one commentator has put it, echoing almost exactly the usual description of state *in rem* proceedings, the § 7403 proceeding

> "from its very nature, is a proceeding in rem. The purchaser receives a complete new title and not just somebody's interest. The court finds the state of the title to the real estate in question, orders it sold if the United States has a lien on it, and divides the proceeds accordingly. All prior interests are cut off and the title starts over again in the new purchaser." Rogge, The Tax Lien of the United States, 13 A. B. A. J. 576, 577 (1927).

See also G. Holmes, Federal Income Tax 546–547 (1920).

Even as it gave the Government the right to seek an undivided sale in an *in rem* proceeding, however, the predecessor to § 7403 departed quite sharply from the model provided by the States by guaranteeing that third parties with an interest in the property receive a share of the proceeds commensurate with the value of their interests. This apparently unique provision was prompted, we can assume, by the sense that, precisely because the federal taxes involved were not taxes on the real property being sold, simple justice required significantly greater solicitude for third parties than was generally available in state *in rem* proceedings.[19]

Finally, our reading of the statute is significantly bolstered by a comparison with the statutory language setting out the administrative levy remedy also available to the Govern-

---

[19] We should note, though, that some States, even outside the context of *in rem* proceedings to enforce property taxation, were not averse to seizing one person's property *without compensation* in order to satisfy the unrelated tax delinquency of another person. See, *e. g.*, *Sears* v. *Cottrell*, 5 Mich. 251 (1858); *Hersee* v. *Porter*, 100 N. Y. 403, 3 N. E. 338 (1885). Cf. *International Harvester Credit Corp.* v. *Goodrich*, 350 U. S. 537 (1956).

ment.[20] Under 26 U. S. C. §6331(a), the Government may sell for the collection of unpaid taxes all nonexempt "property and rights to property . . . *belonging to such person* [*i. e.,* the delinquent taxpayer] or on which there is a lien provided in this chapter for the payment of such tax" (emphasis added). This language clearly embodies the limitation that the Court of Appeals thought was present in §7403, and it has been so interpreted by the courts.[21] Section 6331, unlike §7403, does not require notice and hearing for third parties, because no rights of third parties are intended to be implicated by §6331. Indeed, third parties whose property or interests in property have been seized inadvertently are entitled to claim that the property has been "wrongfully levied upon," and may apply for its return either through administrative channels, 26 U. S. C. §6343(b), or through a civil action filed in a federal district court, §7426(a)(1); see §§7426(b)(1), 7426(b)(2)(A).[22] In the absence of such "wrongful levy," the entire proceeds of a sale conducted pursuant to administrative levy may be applied, without any prior distribution of the sort required by §7403, to the expenses of the levy and sale, the specific tax liability on the seized property, and the general tax liability of the delinquent taxpayer. 26 U. S. C. §6342.

We are not entirely unmoved by the force of the basic intuition underlying the Court of Appeals' view of §7403—that the Government, though it has the "right to pursue the prop-

---

[20] See *Mansfield* v. *Excelsior Refining Co.,* 135 U. S., at 339–341; *National Bank & Trust Co. of South Bend* v. *United States,* 589 F. 2d 1298, 1303 (CA7 1978).

[21] See *Mansfield* v. *Excelsior Refining Co., supra,* at 339–341, discussed in n. 17, *supra; National Bank & Trust Co. of South Bend* v. *United States, supra,* at 1303; *Herndon* v. *United States,* 501 F. 2d 1219, 1223 (CA8 1974); *Stuart* v. *Willis,* 244 F. 2d 925, 929 (CA9 1957); cf. S. Rep. No. 1708, 89th Cong., 2d Sess., 17 (1966).

[22] If the "wrongfully levied upon" property has already been sold, the third party may, of course, have to settle for monetary reimbursement. See 26 U. S. C. §§6343(b)(3), 7426(b)(2)(C).

erty of the [delinquent] taxpayer with all the force and fury at its command," should not have any right, superior to that of other creditors, to disturb the settled expectations of innocent third parties. *Folsom* v. *United States*, 306 F. 2d, at 367–368. In fact, however, the Government's right to seek a forced sale of the entire property in which a delinquent taxpayer had an interest does not arise out of its privileges as an ordinary creditor, but out of the express terms of § 7403. Moreover, the use of the power granted by § 7403 is not the act of an ordinary creditor, but the exercise of a sovereign prerogative, incident to the power to enforce the obligations of the delinquent taxpayer himself, and ultimately grounded in the constitutional mandate to "lay and collect taxes."[23] Cf. *Bull* v. *United States*, 295 U. S., at 259–260; *Phillips* v. *Commissioner*, 283 U. S. 589, 595–597 (1931); *United States* v. *Snyder*, 149 U. S. 210, 214–215 (1893).

Admittedly, if § 7403 allowed for the gratuitous confiscation of one person's property interests in order to satisfy another person's tax indebtedness, such a provision might pose significant difficulties under the Due Process Clause of the Fifth Amendment.[24] But, as we have already indicated, § 7403 makes no further use of third-party property interests than to facilitate the extraction of value from those concurrent property interests that *are* properly liable for the taxpayer's debt. To the extent that third-party property interests are "taken" in the process, § 7403 provides compensation for that "taking" by requiring that the court distribute the proceeds of the sale "according to the findings of the court in respect to the interests of the parties and of the United

---

[23] U. S. Const., Art. I, § 8, cl. 1; Amdt. 16.

[24] But cf. cases cited in n. 19, *supra*.

If there were any Takings Clause objection to § 7403, such an objection could not be invoked on behalf of property interests that came into being after enactment of the provision. See *United States* v. *Security Industrial Bank*, 459 U. S. 70, 82 (1982). In both cases here, the homestead estates at issue came into being long after 1868.

States." Cf. *United States* v. *Overman,* 424 F. 2d, at 1146. Moreover, we hold, on the basis of what we are informed about the nature of the homestead estate in Texas, that it is the sort of property interest for whose loss an innocent third party must be compensated under § 7403. Cf. *United States* v. *General Motors Corp.,* 323 U. S. 373, 377–378 (1945).[25] We therefore see no contradiction, at least at the level of basic principle, between the enforcement powers granted to the Government under § 7403 and the recognition of vested property interests granted to innocent third parties under state law.

The exact method for the distribution required by § 7403 is not before us at this time. But we can get a rough idea of the practical consequences of the principles we have just set out. For example, if we assume, *only for the sake of illustration,* that a homestead estate is the exact economic equivalent of a life estate, and that the use of a standard statutory or commerical table and an 8% discount rate is appropriate in calculating the value of that estate, then three nondelinquent surviving or remaining spouses, aged 30, 50, and 70 years, each holding a homestead estate, would be entitled to approximately 97%, 89%, and 64%, respectively, of the proceeds of the sale of their homes as compensation for that

---

[25] We therefore reject the Government's contention at oral argument, Tr. of Oral Arg. 10, 17–18, that the homestead estate would be irrelevant to a distribution under § 7403, and that, assuming that the entire underlying ownership interest is liable for the delinquent taxes, see n. 27, *infra,* the Government would be entitled to the entire proceeds of the sale.

We also reject the Government's suggestion that the homestead estate held by respondent Rodgers was only contingent at the time that the federal tax lien attached to her husband's interests in her home, and is therefore subordinate to the tax lien. Reply Brief for United States 2, n. 2. The "probate homestead" provided for in Tex. Const., Art. 16, § 52, is clearly, with respect to outside creditors, only a continuation of the separate homestead rights vested in each spouse by Tex. Const., Art. 16, § 50. See *Norman* v. *First Bank & Trust,* 557 S. W. 2d 797, 802 (Tex. Civ. App. 1977).

estate.[26] In addition, if we assume that each of these hypothetical nondelinquent spouses also has a protected half-interest in the underlying ownership rights to the property being sold,[27] then their total compensation would be approximately 99%, 95%, and 82%, respectively, of the proceeds from such sale.

In sum, the Internal Revenue Code, seen as a whole, contains a number of cumulative collection devices, each with its own advantages and disadvantages for the tax collector. Among the advantages of administrative levy is that it is quick and relatively inexpensive. Among the advantages of a § 7403 proceeding is that it gives the Federal Government the opportunity to seek the highest return possible on the forced sale of property interests liable for the payment of federal taxes. The provisions of § 7403 are broad and profound. Nevertheless, § 7403 is punctilious in protecting the vested rights of third parties caught in the Government's collection effort, and in ensuring that the Government not receive out of the proceeds of the sale any more than that to which it is properly entitled. Of course, the exercise in any particular case of the power granted under § 7403 to seek the forced sale of property interests other than those of the delinquent taxpayer is left in the first instance to the good sense and common decency of the collecting authorities. 26 U. S. C. § 7403(a). We also explore in Part IV of this opinion the na-

---

[26] The figures in text are based on the table appearing in Ark. Stat. Ann. § 50–705 (Supp. 1981). See also, e. g., 26 CFR § 20.2031–10 (1982); Actuarial Publishing House, Inc., Commutation Columns and Valuation Factors Based on 1980 CSO Mortality Table (1981).

[27] In the cases before us, the Government argues that, under Texas law, the entire community property (i. e., the underlying ownership interest that we have analogized to a remainder interest), rather than merely the delinquent spouse's half-interest in it, is liable for the indebtedness of the delinquent spouse. Reply Brief for United States 3; see Tex. Fam. Code Ann. § 5.61(c) (1975). The Court of Appeals did not address this issue, and we leave it open for determination on remand. See *Burks* v. *Lasker*, 441 U. S. 471, 486 (1979).

ture of the limited discretion left to the courts in proceedings brought under § 7403. But that the power exists, and that it is necessary to the prompt and certain enforcement of the tax laws, we have no doubt.

## B

There is another, intermeshed but analytically distinguishable, ground advanced by the Court of Appeals and the respondents—and reiterated by the dissent—for denying the Government the right to seek the forced sale of property held as a homestead by a nondelinquent third party. Taken in itself, this view would hold that, even if § 7403 normally allows for the forced sale of property interests other than those directly liable for the indebtedness of the delinquent taxpayer, the special protections accorded by the exemption aspect of Texas homestead law, see *supra*, at 685–686, should immunize it from the reach of § 7403.

The Court of Appeals conceded that "the homestead interest of a *taxpayer* spouse, *i. e.*, that of one who himself has tax liability, clearly cannot by itself defeat [the enforcement under § 7403 of] a federal tax lien." 649 F. 2d, at 1121 (emphasis in original); see also 649 F. 2d, at 1132 (authorizing levy on proceeds in *Ingram* case to the extent of the $283.33 liability jointly owed by Mr. and Mrs. Ingram). This proposition, although not explicit in the Code, is clearly implicit in 26 U. S. C. § 6334(c) (relating to exemptions from levy),[28] and in our decisions in *United States* v. *Mitchell*, 403 U. S., at 204–205; *Aquilino* v. *United States*, 363 U. S., at 513–514; and *United States* v. *Bess*, 357 U. S., at 56–57, discussed *supra*, at 683. The Court of Appeals also held that, if the homestead interest under Texas law were "merely an exemption" without accompanying vested property rights, it would not be effective against the Federal Government in a § 7403

---

[28] Section 6334(c) provides: "Notwithstanding any other law of the United States, no property or rights to property shall be exempt from levy other than the property specifically made exempt by [§ 6334(a).]"

proceeding, even in the case of a *non*delinquent spouse. 649 F. 2d, at 1125. Nevertheless, the court concluded that, if the homestead estate *both* was claimed by a nondelinquent spouse *and* constituted a property right under state law, then it *would* bar the Federal Government from pursuing a forced sale of the entire property.

We disagree. If § 7403 is intended, as we believe it is, to reach the entire property in which a delinquent taxpayer has or had any "right, title, or interest," then state-created exemptions against forced sale should be no more effective with regard to the entire property than with regard to the "right, title, or interest" itself. Accord, *United States* v. *Overman*, 424 F. 2d, at 1145–1147; *Herndon* v. *United States*, 501 F. 2d 1219, 1223–1224 (CA8 1974) (Ross, J., concurring).[29] No exception of the sort carved out by the Court of Appeals appears on the face of the statute, and we decline to frustrate the policy of the statute by reading such an exception into it. Cf. *Hisquierdo* v. *Hisquierdo*, 439 U. S. 572, 586–587 (1979); *United States* v. *Mitchell, supra,* at 205–206. Moreover, the Supremacy Clause[30]—which provides the underpinning for the Federal Government's right to sweep aside state-created exemptions in the first place—is as potent in its application to innocent bystanders as in its application to delinquent debtors. See *United States* v. *Union Central Life Insurance Co.*, 368 U. S., at 293–295 (federal tax lien good against bona fide purchaser, even though lien not filed in accordance with provisions of state law); cf. *Hisquierdo* v. *Hisquierdo, supra,* at 585–586; *United States* v. *Carmack*, 329 U. S. 230, 236–

---

[29] The Court of Appeals claimed that its view was consistent with that of the Tenth Circuit in *United States* v. *Hershberger*, 475 F. 2d 677 (1973). *Hershberger* does bear similarities to the Fifth Circuit's analysis, particularly in the distinction it draws between the two different types of homestead rights, and in its adoption of an absolute rule against certain forced sales. As we read *Hershberger*, however, it relies on an equitable analysis rather than on the inherent force of state homestead law to defeat a sale of entire property under § 7403. *Id.*, at 679.

[30] U. S. Const., Art. VI, cl. 2.

240 (1946). Whatever property rights attach to a homestead under Texas law are adequately discharged by the payment of compensation, and no further deference to state law is required, either by § 7403 or by the Constitution.

The dissent urges us to carve out an exception from the plain language of § 7403 in that "small number of joint-ownership situations . . . [in which] the delinquent taxpayer has no right to force partition or otherwise to alienate the entire property without the consent of the co-owner." *Post*, at 715. Its primary argument in favor of such an exception is that it would be consistent with traditional limitations on the rights of a lienholder. *Post*, at 713–715, 723–724. If § 7403 truly embodied traditional limitations on the rights of lienholders, however, then we would have to conclude that *Folsom* v. *United States*, 306 F. 2d 361 (CA5 1962), discussed *supra*, at 690, 696–697, was correctly decided, a proposition that even the dissent is not willing to advance. See *post*, at 713, 714, n. 2, 726. More importantly, we believe that the better analogy in this case is not to the traditional rights of lienholders, but to the traditional powers of a taxing authority in an *in rem* enforcement proceeding. See *supra*, at 694–695.[31]

---

[31] In addition to its reliance on the traditional limitations imposed on lienholders, which we discuss in text, and on its reading of *Mansfield* v. *Excelsior Refining Co.*, 135 U. S. 326 (1890), which we discuss in n. 17, *supra*, the dissent makes a number of additional arguments which require at least a brief response. First, it claims that the weight of authority is on its side. *Post*, at 717–718, and nn. 6, 7. The dissent's use of sources largely overlooks, however, the important distinction between the power of sale under § 7403 on the one hand and the extent of the underlying lien and the power of administrative levy on the other. See *supra*, at 690–691, and n. 16, 695–696, and nn. 20, 21. For example, only one of the five cases cited in the dissent's n. 7 deals with § 7403. Three of the five deal with administrative levy, and are therefore entirely consistent with the views we express in this opinion, and one concerns a judicial foreclosure conducted in state court without the benefit of § 7403. Moreover, the one case that does deal with § 7403, *United States* v. *Hershberger, supra*, gives only meager support to the dissent's position. See n. 29, *supra*. Similarly, not one of the secondary sources cited in the dissent's n. 6

## IV

## A

Although we have held that the Supremacy Clause allows the federal tax collector to convert a nondelinquent spouse's

---

focuses on § 7403, and most merely report the line of administrative levy cases with which we are in agreement.

Second, the dissent relies on a piece of 1954 legislative history concerning the application of the federal tax lien to interests in tenancies by the entirety. *Post*, at 719–720. Quite apart from the fact that the dissent's argument depends on events taking place almost a century after enactment of the statute at issue, it suffers from two further serious flaws.

(1) The question at issue in 1954 bears only the most tangential relationship to that at issue here. The amendments at issue in 1954 did not concern § 7403. More important, tenancies by the entirety pose a problem quite distinct from that at issue in the case of homestead rights. See *Herndon* v. *United States*, 501 F. 2d, at 1220–1221; W. Plumb, Federal Tax Liens 37–38 (3d ed. 1972). The basic holding of the line of cases mentioned by the dissent was, not merely that interests in a tenancy by the entirety could not be sold to satisfy a tax debt of one spouse, but that, as a result of the peculiar legal fiction governing tenancies by the entirety in some States, no tax lien could attach in the first place because neither spouse possessed an independent interest in the property. See, *e. g.*, *United States* v. *American National Bank of Jacksonville*, 255 F. 2d 504, 506 (CA5 1958); *United States* v. *Hutcherson*, 188 F. 2d 326, 331 (CA8 1951). Indeed, in most of the cases in this line, the Government was *not* trying to sell the property out from under the nondelinquent spouse, but was merely trying to exercise one of the more benign rights of a lienholder to which the dissent would automatically relegate the Government in this case. In the homestead context, by contrast, there is no doubt, even under state law, that not only do *both* spouses (rather than neither) have an independent interest in the homestead property, but that a federal tax lien can at least *attach* to each of those interests. See *Paddock* v. *Siemoneit*, 147 Tex. 571, 584–585, 218 S. W. 2d 428, 436 (1949). Thus, *if* the tenancy by the entirety cases are correct, they do no more than illustrate the proposition that, in the tax enforcement context, federal law governs the consequences that attach to property interests, but state law governs whether any property interests exist in the first place. See *supra*, at 683.

(2) Even if the 1954 legislative history cited by the dissent were relevant to the issues in these cases, our reading of the pertinent Committee Reports suggests to us, not that "the Senate foiled an attempt by the House to *extend* the reach of federal tax liens to tenancies by the entirety," *post*,

homestead estate into its fair cash value, and that such a conversion satisfies the requirements of due process, we are not blind to the fact that in practical terms financial compensation may not always be a completely adequate substitute for a roof over one's head. Cf. *United States* v. *564.54 Acres of Land,* 441 U. S. 506, 510–513 (1979). This problem seems particularly acute in the case of a homestead interest. First, the nature of the market for life estates or the market for rental property may be such that the value of a homestead interest, calculated as some fraction of the total value of a home, would be less than the price demanded by the market for a lifetime's interest in an equivalent home. Second, any calculation of the cash value of a homestead interest must of necessity be based on actuarial statistics, and will unavoidably undercompensate persons who end up living longer than the average.[32] Indeed, it is precisely because of problems such as these that a number of courts, in eminent domain cases involving property divided between a homestead interest and underlying ownership rights or between a life estate and a remainder interest, have refused to distribute the pro-

---

at 719 (emphasis added), but that the House sought to "*clarif[y]* the term 'property and rights to property' by *expressly* including therein the interest of the delinquent taxpayer in an estate by the entirety," H. R. Rep. No. 1337, 83d Cong., 2d Sess., A406 (1954) (emphasis added), and that the Senate rejected that clarification, not necessarily because it disagreed with it, but more likely because it found it superfluous, see S. Rep. No. 1622, 83d Cong., 2d Sess., 575 (1954) ("It is not clear what change in existing law would be made by the parenthetical phrase [suggested by the House]. The deletion of the phrase is intended to continue the existing law").

Finally, the dissent argues that our reading of § 7403 is rendered less likely by the fact that "[p]rior to 1936, . . . the predecessor of § 7403(c) *required* a court at the Government's request to sell the property in which the tax debtor had an interest." *Post,* at 723–724. As we make clear in our discussion of the may/shall issue, *infra,* at 706–709, however, we are not at all convinced that a sale of the undivided property was mandatory even prior to 1936.

[32] See 1 L. Orgel, Valuation Under the Law of Eminent Domain § 118, p. 511 (2d ed. 1953) (hereinafter Orgel).

ceeds according to an actuarial formula, and have instead placed the entire award in trust (or reinvested it in a new parcel of property) with the income (or use) going to the life-estate holder during his or her lifetime, and the corpus vesting in the holder of the remainder interest upon the death of the life-estate holder.[33]

If the sale and distribution provided for in § 7403 were mandatory, the practical problems we have just described would be of little legal consequence. The statute provides, however, that the court in a § 7403 proceeding *"shall . . . proceed to adjudicate all matters involved therein and finally determine the merits of all claims to and liens upon the property, and, in all cases where a claim or interest of the United States therein is established, may decree a sale of such property . . ."* (emphasis added), and respondents argue that this language allows a district court hearing a § 7403 proceeding to exercise a degree of equitable discretion and refuse to authorize a forced sale in a particular case. See *Tillery* v. *Parks*, 630 F. 2d 775 (CA10 1980); *United States* v. *Eaves*, 499 F. 2d 869, 870–871 (CA10 1974); *United States* v. *Hershberger*, 475 F. 2d, at 679–680; *United States* v. *Overman*, 424 F. 2d, at 1146; *United States* v. *Morrison*, 247 F. 2d 285, 289–291 (CA5 1957). The Court of Appeals agreed

---

[33] See, *e. g., United States* v. *403.15 Acres of Land*, 316 F. Supp. 655, 657–658 (MD Tenn. 1970); *United States* v. *380 Acres of Land*, 47 F. Supp. 6 (WD Ky. 1942); *Bonner* v. *Peterson*, 44 Ill. 253, 259 (1867); *In re Camp*, 126 N. Y. 377, 27 N. E. 799 (1891); *Redevelopment Comm'n of Greenville* v. *Capehart*, 268 N. C. 114, 118, 150 S. E. 2d 62, 65 (1966); *Lucas* v. *Lucas*, 104 Tex., at 641–642, 143 S. W., at 1155–1156 (condemnation of homestead).

But cf., *e. g., United States* v. *818.76 Acres of Land*, 310 F. Supp. 210 (WD Mo. 1969); *Brugh* v. *White*, 267 Ala. 575, 103 So. 2d 800 (1957); *School District of Columbia* v. *Jones*, 229 Mo. 510, 129 S. W. 705 (1910); *Aue* v. *State*, 77 S. W. 2d 606 (Tex. Civ. App. 1934), all allowing apportionment.

See generally A. Jahr, Law of Eminent Domain: Valuation and Procedure § 129 (1953); 4 J. Sackman, Nichols' Law of Eminent Domain § 12.46[1] (3d ed. 1980); 1 Orgel § 118.

with this interpretation of the statute, although it does not appear to have relied on it, 649 F. 2d, at 1125, and in any event neither it nor the District Court undertook any particularized equitable assessment of the cases now before us. We find the question to be close, but on balance, we too conclude that § 7403 does not require a district court to authorize a forced sale under absolutely all circumstances, and that some limited room is left in the statute for the exercise of reasoned discretion.

## B

The word "may," when used in a statute, usually implies some degree of discretion.[34] This common-sense principle of statutory construction is by no means invariable, however, see *Mason* v. *Fearson*, 9 How. 248, 258–260 (1850); see generally *United States ex rel. Siegel* v. *Thoman*, 156 U. S. 353, 359–360 (1895), and cases cited, and can be defeated by indications of legislative intent to the contrary or by obvious inferences from the structure and purpose of the statute, see *ibid.*

In these cases, we have little to go on in discerning Congress' intent except for one crucial fact: before 1936, the predecessor statute to § 7403 used the word "shall" rather than the word "may" in describing the court's role in ordering a forced sale of property in which a claim or interest of the United States had been shown. Revenue Act of 1926, Pub. L. 20, § 1127, 44 Stat. (part 2) 9, 123–124. In 1936, as one of a number of amendments in the text of the provision, Congress changed "shall" to "may." Revenue Act of 1936, Pub. L. 740, § 802, 49 Stat. 1648, 1743–1744. The other changes— specifically, expanding the scope of § 7403 to include personal as well as real property, and adding the receivership option

---

[34] See *Haig* v. *Agee*, 453 U. S. 280, 294, n. 26 (1981); *Anderson* v. *Yungkau*, 329 U. S. 482, 485 (1947); *Farmers & Merchants Bank* v. *Federal Reserve Bank*, 262 U. S. 649, 662–663 (1923); *Thompson* v. *Lessee of Carroll*, 22 How. 422, 434 (1860).

now embodied in § 7403(d), see *supra*, at 681—are explained in the legislative history.[35] There is no direct explanation for the change from "shall" to "may." [36]

The Government argues that the only significance of the change from "shall" to "may" was that "Congress recognized it had specifically authorized sale of interests in property, sale of the entire property, and receivership. Employing the term 'shall' with respect to each may have been perceived as confusing insofar as it could be read as directing contradictory requirements." Reply Brief for United States 8, n. 5.

---

[35] The 1936 provision was introduced in the Senate as a committee-approved floor amendment to a comprehensive revenue bill originating in the House. 80 Cong. Rec. 9072 (1936). Its origins can be traced, however, to an earlier unpassed House bill seeking to amend certain administrative features of the tax laws. See H. R. 12793, 74th Cong., 2d Sess. (1936). The impetus for the provision, as explained in the House Report accompanying the earlier bill, was that the only then-existing remedy for the enforcement of tax liens against personal property was administrative levy, which in certain cases caused considerable hardship to both the taxpayer and the Government. The receivership option now contained in § 7403(d) was similarly conceived as a means of avoiding undue disruption of ongoing concerns whose assets were seized as part of a tax enforcement effort. See H. R. Rep. No. 2818, 74th Cong., 2d Sess., 7–8 (1936).

[36] Virtually the only difference between the earlier House version and the floor amendment introduced in the Senate was the crucial substitution of "may" for "shall" in the descriptions of both the court's power to order a forced sale and its power to appoint a receiver. The sponsor of the floor amendment, however, only had the following to say about its significance:

"Mr. President, this amendment would permit the collector of internal revenue to apply to the United States courts, to file a petition in equity to enforce a lien for taxes where he has reason to believe the taxpayer will not be able to meet his obligations, and where public interest will be prejudiced by resorting to the provisions in the present law, for distraint on the taxpayer's assets. In other words, it is an amendment more favorable to the taxpayer than are the provisions of the present law." 80 Cong. Rec., at 9072 (Sen. Walsh).

Although the last sentence of Senator Walsh's comments might, taken out of context, be read to refer to the change from "shall" to "may," we think it more likely that he was referring to the same concerns that motivated the earlier House version.

We find this explanation plausible, but not compelling. If Congress had really meant no more than to adjust the forced sale language to take into account the receivership option, it could have easily expressed that intention more clearly by language to the effect of "the court *shall either* decree the sale of such property . . . *or*, upon the instance of the United States, appoint a receiver to enforce the lien, etc." Moreover, the authors of an earlier, unpassed, otherwise virtually identical proposal introduced in the House, did not think it necessary to change "shall" to "may" in their version of the legislation. See nn. 35, 36, *supra*.

Faced as we are with such an ambiguous legislative record, we come to rest with the natural meaning of the language enacted into law. In light of the fact that Congress did see fit to explain the other changes in the 1936 Act, we do not assert that Congress, without comment or explanation, intended to create equitable discretion where none existed before. On the other hand, there is support in our prior cases for the proposition that an unexplained change in statutory wording from "shall" to "may" is best construed as indicating a congressional belief that equitable discretion existed all along. *Moore* v. *Illinois Central R. Co.*, 312 U. S. 630, 635 (1941); cf. *Haig* v. *Agee*, 453 U. S. 280, 294, n. 26 (1981).

In addition, reading "may" as either conferring or confirming a degree of equitable discretion conforms to the even more important principle of statutory construction that Congress should not lightly be assumed to have enacted a statutory scheme foreclosing a court of equity from the exercise of its traditional discretion. *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 313 (1982); *Porter* v. *Warner Holding Co.*, 328 U. S. 395, 398 (1946); *Hecht Co.* v. *Bowles*, 321 U. S. 321, 330 (1944). A § 7403 proceeding is by its nature a proceeding in equity,[37] and judicial sales in general have traditionally

---

[37] This is even clearer in the statutory language as it existed prior to 1954: "In any case where there has been a refusal or neglect to pay any tax,

been accompanied by at least a limited degree of judicial discretion.[38]

Finally, we are convinced that recognizing that district courts may exercise a degree of equitable discretion in § 7403 proceedings is consistent with the policies of the statute: unlike an absolute exception, which we rejected above, the exercise of limited equitable discretion in individual cases can take into account both the Government's interest in prompt and certain collection of delinquent taxes and the possibility that innocent third parties will be unduly harmed by that effort.

## C

To say that district courts need not always go ahead with a forced sale authorized by § 7403 is not to say that they have unbridled discretion. We can think of virtually no circumstances, for example, in which it would be permissible to refuse to authorize a sale simply to protect the interests of the delinquent taxpayer himself or herself.[39] And even when the interests of third parties are involved, we think that a

---

. . . the Attorney General at the request of the Commissioner of Internal Revenue may *direct a bill in chancery to be filed . . . .*" See Revenue Act of 1936, Pub. L. 740, § 802, 49 Stat. 1648, 1743–1744 (emphasis added). The language used in the 1954 Code was presumably adopted to conform to Federal Rule of Civil Procedure 2, but it was not intended to effect any material change from previous law. See H. R. Rep. No. 1337, 83d Cong., 2d Sess., A431 (1954).

[38] See, *e. g., Semmes Nurseries, Inc.* v. *McDade,* 288 Ala. 523, 530–531, 263 So. 2d 127, 132–133 (1972); *Thomas* v. *Klein,* 99 Idaho 105, 107, 577 P. 2d 1153, 1155 (1978); *National Bank of Washington* v. *Equity Investors,* 81 Wash. 2d 886, 924–927, 506 P. 2d 20, 43–44 (1973).

The analogy to other types of judicial sales is strained somewhat by the fact that most ordinary judicial sales do not implicate the interests of third parties with independent possessory rights in the property being sold. This difference, however, only strengthens the case for the existence of judicial discretion in § 7403 proceedings.

[39] This is not to say that a forced sale may not be temporarily postponed, or made subject to an upset price, in order to do justice in an individual case.

certain fairly limited set of considerations will almost always be paramount.

First, a court should consider the extent to which the Government's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes. Even the Government seems to concede that, if such a partial sale would not prejudice it at all (because the separate market value of the partial interest is likely to be equal to or greater than its value as a fraction of the total value of the entire property) then there would be no reason at all to authorize a sale of the entire property. Tr. of Oral Arg. 7, 13; Reply Brief for United States 8, n. 5.[40] We think that a natural extension of this principle, however, is that, even when the partial interest would be worth *less* sold separately than sold as part of the entire property, the possibility of prejudice to the Government can still be measured as a matter of degree. Simply put, the higher the expected market price, the less the prejudice, and the less weighty the Government's interest in going ahead with a sale of the entire property.[41]

Second, a court should consider whether the third party with a nonliable separate interest in the property would, in the normal course of events (leaving aside § 7403 and eminent domain proceedings, of course), have a legally recognized expectation that that separate property would not be subject

---

[40] There would also be no prejudice to the Government if the proceeds from the sale of the partial interest, even though they might be less than the value of the partial interest as a fraction of the total value of the entire property, would still be more than enough to satisfy the delinquent taxpayer's indebtedness, or if the taxpayer's indebtedness could be satisfied out of other property to which he had sole and complete title. In the former case, however, a court might still have to strike an equitable balance between the interests of the delinquent taxpayer and the interests of the nondelinquent third party.

[41] The prejudice to the Government of forgoing an immediate sale of the entire property might also be considered fairly minimal if the third-party interest at stake could be expected to lapse in the relatively near future.

to forced sale by the delinquent taxpayer or his or her creditors. If there is no such expectation, then there would seem to be little reason not to authorize the sale. Again, however, this factor is amenable to considerations of degree. The Texas homestead laws are almost absolute in their protections against forced sale.[42] The usual cotenancy arrangement, which allows any cotenant to seek a judicial sale of the property and distribution of the proceeds, but which also allows the other cotenants to resist the sale and apply instead for a partition in kind, is further along the continuum. And a host of other types of property interests are arrayed between and beyond.

Third, a court should consider the likely prejudice to the third party, both in personal dislocation costs and in the sort of practical undercompensation described *supra*, at 704–705.

Fourth, a court should consider the relative character and value of the nonliable and liable interests held in the property: if, for example, in the case of real property, the third party has no present possessory interest or fee interest in the property, there may be little reason not to allow the sale; if, on the other hand, the third party not only has a possessory interest or fee interest, but that interest is worth 99% of the value of the property, then there might well be virtually no reason to allow the sale to proceed.

We do not pretend that the factors we have just outlined constitute an exhaustive list; we certainly do not contemplate that they be used as a "mechanical checklist" to the exclusion of common sense and consideration of special circumstances. Cf. *Moses H. Cone Hospital* v. *Mercury Construction Corp.*, 460 U. S. 1, 16 (1983). We do emphasize, however, that the limited discretion accorded by § 7403 should be exercised rigorously and sparingly, keeping in mind the Government's paramount interest in prompt and certain collection of delinquent taxes.

---

[42] But cf. n. 10, *supra*.

## V

In these cases, no individualized equitable balance of the sort we have just outlined has yet been attempted. In the *Rodgers* case, the record before us, although it is quite clear as to the legal issues relevant to the second consideration noted above, affords us little guidance otherwise. In any event, we think that the task of exercising equitable discretion should be left to the District Court in the first instance.

The *Ingram* case is a bit more complicated, even leaving aside the fact of the stipulated sale by which we are constrained to treat the escrow fund now sitting in the registry of the District Court as if it were a house. First, as the Court of Appeals pointed out, there remains a question under Texas law as to whether Joerene Ingram abandoned the homestead by the time of the stipulated sale. Second, the Government, in addition to its lien for the individual debt of Donald Ingram, has a further lien for $283.33, plus interest, on the house, representing the joint liability of Donald and Joerene Ingram. Because Joerene Ingram is not a "third party" as to that joint liability, we can see no reason, as long as that amount remains unpaid, not to allow a "sale" of the "house" (*i. e.*, a levy on the proceeds of the stipulated sale) for satisfaction of the debt. Moreover, once the dam is broken, there is no reason, under our interpretation of § 7403, not to allow the Government also to collect on the individual debt of Donald Ingram *out of that portion of the proceeds of the sale representing property interests properly liable for the debt.* On the other hand, it would certainly be to Mrs. Ingram's advantage to discharge her personal liability before the Government can proceed with its "sale," in which event, assuming that she has not abandoned the homestead, the District Court will be obliged to strike an equitable balance on the same general principles as those that govern the *Rodgers* case.

The judgment of the Court of Appeals in *Rodgers* is reversed, its judgment in *Ingram* is vacated, and both cases

are remanded with directions that they be remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*

JUSTICE BLACKMUN, with whom JUSTICE REHNQUIST, JUSTICE STEVENS, and JUSTICE O'CONNOR join, concurring in the result in part and dissenting in part.

The Court today properly rejects the broad legal principle concerning 26 U. S. C. § 7403 that was announced by the Court of Appeals. See *ante*, at 687–688 and 690–691. I agree that, in some situations, § 7403 gives the Government the power to sell property *not* belonging to the taxpayer. Our task, however, is to ascertain how far Congress intended that power to extend. In my view, § 7403 confers on the Government the power to sell or force the sale of jointly owned property only insofar as the *tax debtor's* interest in that property would permit *him* to do so; it does not confer on the Government the power to sell jointly owned property if an unindebted co-owner enjoys an *indestructible* right to bar a sale and to continue in possession. Because Mrs. Rodgers had such a right, and because she is not herself indebted to the Government, I dissent from the Court's disposition of her case.

## I

It is basic in the common law that a lienholder enjoys rights in property no greater than those of the debtor himself; that is, the lienholder does no more than step into the debtor's shoes. 1 L. Jones, Law of Liens § 9, pp. 9–10 (1914). Thus, as a general rule, "[t]he lien of a judgment . . . cannot be made effectual to bind or to convey any greater or other estate than the debtor himself, in the exercise of his rights, could voluntarily have transferred or alienated." 49 C. J. S., Judgments § 478 (1947) (collecting cases); *Commercial Credit Co.* v. *Davidson*, 112 F. 2d 54, 57 (CA5 1940); *Wiltshire* v. *Warburton*, 59 F. 2d 611, 614 (CA4 1932). Similarly, pursuant to a state tax lien, "no greater interest in land than that

which was held by the taxpayer and taxable to him may be sold, so that, where a sale is had for unpaid taxes on a leasehold estate, only the leasehold estate is subject to conveyance."[1] 85 C. J. S., Taxation § 806 (1954) (footnote omitted) (collecting cases); *United States* v. *Erie County*, 31 F. Supp. 57, 60 (WDNY 1939). The lienholder may compel the debtor to exercise his property rights in order to meet his obligations or the lienholder may exercise those rights for him. But the debtor's default does not vest in the lienholder rights that were not available to the debtor himself.

In most situations in which a delinquent taxpayer shares property with an unindebted third party, it does no violence to this principle to order a sale of the entire property so long as the third party is fully compensated. A joint owner usually has at his disposal the power to convey the property or force its conveyance. Thus, for example, a joint tenant or tenant in common may seek partition. See generally W. Plumb, Federal Tax Liens 35 (3d ed. 1972). If a joint tenant is delinquent in his taxes, the United States does no more than step into the delinquent taxpayer's shoes when it compels a sale.[2]

---

[1] See *infra*, at 726–728.

[2] "Every jurisdiction permits partition by sale in a proper case." 4A R. Powell, Real Property ¶ 613, p. 655 (1982). The same treatise observes: "Lip service is still given to the historical preference for physical division of the affected land, but sale normally is the product of a partition proceeding, either because the parties all wish it or because courts are easily convinced that sale is necessary for the fair treatment of the parties." ¶ 612, p. 652. The Government views application of § 7403 as constrained by like principles. Tr. of Oral Arg. 7; see *id.*, at 13; n. 14, *infra*.

Thus, stepping into the shoes of the tenant in common or joint tenant, the Government may force a sale of the entire property where sale is necessary for fair treatment of the parties or where the parties desire it. For these reasons, I agree with the Court that the Court of Appeals in these cases erred in relying on *Folsom* v. *United States*, 306 F. 2d 361 (CA5 1962), which held that the Government cannot seek the sale of jointly owned property, even when the tax debtor's rights in the property include the right to partition the property or seek a forced sale. See *id.*, at 365.

In a small number of joint-ownership situations, however, the delinquent taxpayer has no right to force partition or otherwise to alienate the entire property without the consent of the co-owner. These include tenancies by the entirety and certain homestead estates. See Plumb, Federal Liens and Priorities—Agenda for the Next Decade II, 77 Yale L. J. 605, 634 (1968). In this case, the homestead estate owned by the delinquent taxpayer—Mrs. Rodgers' deceased husband—did not include the right to sell or force the sale of the homestead during Mrs. Rodgers' lifetime without her consent. Mrs. Rodgers had, and still has, an indefeasible right to possession, an interest, as the Court recognizes, "akin to an undivided life estate." *Ante*, at 686. A lienholder stepping into the shoes of the delinquent taxpayer would not be able to force a sale.

## II

By holding that the District Court has the discretion to order a sale of Mrs. Rodgers' property, the Court necessarily finds in the general language of § 7403 a congressional intent to abrogate the rule that the tax collector's lien does not afford him rights in property in excess of the rights of the delinquent taxpayer.[3] I do not dispute that the general

---

[3] In the Court's words, when the Government exercises its "right to seek a forced sale" under § 7403, *ante*, at 691, Congress means it to walk not in the tax debtor's shoes, but in the full panoply of "sovereign prerogative." *Ante*, at 697. Yet the Court recognizes that the common-law principle limiting the property rights of the lienholder to those of the debtor long has been assumed in the federal law of tax liens. *Ante*, at 690–691, and n. 16, quoting 4 B. Bittker, Federal Taxation of Income, Estates, and Gifts ¶ 111.5.4, p. 111–102 (1981) ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out"). See Anderson, Federal Tax Liens—Their Nature and Priority, 41 Calif. L. Rev. 241, 250 (1953) ("The rights of the Government to the taxpayer's property under a tax lien are no greater than the rights of the taxpayer. Or, to put it more simply, the tax collector stands in the shoes of the taxpayer when reaching the taxpayer's property"); Reid, Tax Liens, Their Operation and Effect, New York University Ninth Annual Institute on Federal Taxation 563, 568 (1951) ("It is clear, of course, that the government's rights as lienor are no greater than

language of § 7403, standing alone, is subject to the interpretation the Court gives it. From its enactment in 1868[4] to the present day, the language of this statute has been sweeping; read literally, it admits of no exceptions. But when broadly worded statutes, particularly those of some antiquity, are in derogation of common-law principles, this Court has hesitated to heed arguments that they should be applied literally. See *Imbler* v. *Pachtman*, 424 U. S. 409, 417 (1976). In such cases, the Court has presumed in the absence of a clear indication to the contrary that Congress did not mean by its use of general language to contravene fundamental precepts of the common law.[5]

---

the rights of the tax-debtor"); Clark, Federal Tax Liens and Their Enforcement, 33 Va. L. Rev. 13, 17 (1947) ("It is obvious, of course, that the federal tax lien can only reach the property of its tax-debtor and that [the Government's] rights as lienor to property or rights to property of its tax-debtor can rise no higher than the rights of the latter in that property or rights to property").

[4] Much like the current § 7403, the initial version authorized suit by the Commissioner "to enforce the lien of the United States for tax upon any real estate, or to subject any real estate owned by the delinquent, or in which he has any right, title, or interest, to the payment of such tax." Act of July 20, 1868, ch. 186, § 106, 15 Stat. 125, 167.

[5] Despite the absolute language of 42 U. S. C. § 1983, the Court has concluded that "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Imbler* v. *Pachtman*, 424 U. S. 409, 418 (1976). The Court has assumed that "members of the 42d Congress were familiar with common-law principles, including defenses previously recognized in ordinary tort litigation, and that they likely intended these common-law principles to obtain, absent specific provisions to the contrary." *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247, 258 (1981). Pursuant to this approach, the Court has applied various common-law immunities to § 1983 actions. See, *e. g.*, *Briscoe* v. *LaHue*, 460 U. S. 325 (1983) (witnesses); *Nixon* v. *Fitzgerald*, 457 U. S. 731 (1982) (President); *Imbler* v. *Pachtman, supra* (state prosecutor); *Scheuer* v. *Rhodes*, 416 U. S. 232 (1974) (state executive officers); *Pierson* v. *Ray*, 386 U. S. 547 (1967) (state judge); *Tenney* v. *Brandhove*, 341 U. S. 367 (1951) (state legislator).

Similarly, in *United States* v. *Sanges*, 144 U. S. 310, 322–323 (1892), the Court refused to permit the Government to appeal an adverse judgment in

## A

Apart from the general language of the statute, the Court points to nothing indicating a congressional intent to abrogate the traditional rule. It seems to me, indeed, that the evidence definitely points the other way. Scholarly comment on § 7403, and on § 6321, the tax lien provision, consistently has maintained that, in States such as Texas that confer on each spouse absolute rights to full use and possession of the homestead for life, the homestead property rights of an unindebted spouse may not be sold by the tax collector to satisfy the other spouse's tax debt.[6] Court decisions address-

---

a criminal case, despite a statute conferring appellate jurisdiction "[i]n any case that involves the construction or application of the Constitution of the United States," Act of Mar. 3, 1891, ch. 517, § 5, 26 Stat. 827, 828. The Court declared: "This statute, like all acts of Congress, and even the Constitution itself, is to be read in the light of the common law," 144 U. S., at 311, which disfavored such appeals. Before it would conclude that Congress intended to legislate in derogation of a basic common-law rule, the Court required a specific expression of intent.

The concerns underlying the rule that the lienholder gains only the property rights of the debtor are as basic as those underlying the rules in *Sanges* and the § 1983 immunity cases. The taking of one person's indefeasible property rights to pay another person's debts, even with compensation, strikes a discordant note. Cf. *Hoeper* v. *Tax Comm'n*, 284 U. S. 206 (1931) (uncompensated taking of wife's property to pay husband's tax debt violates Due Process and Equal Protection Clauses of Fourteenth Amendment); *id.*, at 219 (Holmes, J., dissenting). The question here, as in *Sanges* and the § 1983 cases, is whether Congress intended this statute to reach that far. It is a well-recognized rule of statutory construction, flowing from a strong policy of respecting traditional property rights, that legislative grants of the takings power may be found in legislation only by express provision or necessary implication. See 3 C. Sands, Sutherland on Statutes and Statutory Construction § 64.06 (4th ed. 1974) (collecting cases); cf. *United States* v. *Wilson*, 420 U. S. 332, 336 (1975) (*Sanges* based on common-law rule of construction requiring explicit legislative authorization for state appeal in criminal case). As shown below, neither may be found in the language, policies, or legislative history of § 7403.

[6] See W. Plumb, Federal Tax Liens 38 (3d ed. 1972); American Bar Association, Report of the Special Committee on Federal Liens, 84 A. B. A.

ing this point have been to the same effect.[7] In 1966, the American Bar Association placed before Congress this virtually undisputed view of the law of federal tax liens. Legislative History 177.[8] Since 1936, Congress repeatedly has ad-

Rep. 645, 682 (1959); Anderson, *supra* n. 3, at 254; Clark, *supra* n. 3, at 17; Plumb, Federal Liens and Priorities—Agenda for the Next Decade II, 77 Yale L. J. 605, 634, and n. 194 (1968); Plumb, Federal Tax Collection and Lien Problems, pt. I, 13 Tax L. Rev. 247, 262–263 (1958); Reid, *supra* n. 3, at 568. Mr. Plumb's views may be due particular attention, because he was the principal draftsman of the Federal Tax Lien Act of 1966. See Hearings on H. R. 11256 and H. R. 11290, p. 60, Legislative History of the Federal Tax Lien Act of 1966, p. 104 (Committee Print compiled for House Committee on Ways and Means, 1966) (hereinafter Legislative History) (statement of Laurens Williams). The commentators also consistently have observed that state homestead laws that merely exempt homestead property from the reach of creditors, rather than vesting indestructible rights in each spouse, are ineffective against federal tax liens. *E. g.*, Plumb, 77 Yale L. J., at 634. See *United States* v. *Heasley*, 283 F. 2d 422, 427 (CA8 1960).

[7] *United States* v. *Hershberger*, 475 F. 2d 677, 682 (CA10 1973); *Jones* v. *Kemp*, 144 F. 2d 478, 480 (CA10 1944); *Morgan* v. *Moynahan*, 86 F. Supp. 522, 525 (SD Tex. 1949); *Bigley* v. *Jones*, 64 F. Supp. 389, 391 (WD Okla. 1946); *Paddock* v. *Siemoneit*, 147 Tex. 571, 585, 218 S. W. 2d 428, 436 (1949).

[8] The Government, in its brief, relies on the American Bar Association's recommendation to Congress, contained in the Report of the ABA Committee on Federal Liens, that federal tax liens not be made subject to the exemption laws of the States. Brief for United States 30, quoting Final Report of the Committee on Federal Liens (1959), reprinted in Legislative History 75, 175–176. As the Government says, "[t]he committee . . . rejected the basic notion as inappropriate, and Congress thereafter refrained from implementing it." Brief for United States 30.

In light of its reliance on this aspect of the ABA Report, it is strange that the Government did not call to the Court's attention a passage appearing on the very next page of the ABA Report, under the heading *"Homesteads"*:

"The homestead exemption laws of the States do not apply as against the federal tax lien. But the homestead laws of some States have been held to create an indivisible and vested interest in the husband and wife, which

dressed the law of federal tax liens, directing some attention to § 7403.[9] Against the background of this consensus among courts and commentators that tax liens may not be enforced against such homesteads so long as an unindebted spouse still lives, Congress did not change the law.

In fact, in 1954 the Senate foiled an attempt by the House to extend the reach of federal tax liens to tenancies by the entirety, a spousal property interest similar to the Texas homestead.[10] The rule pronounced in the courts, *e. g.*, *United States* v. *Hutcherson*, 188 F. 2d 326, 331 (CA8 1951); *United States* v. *Nathanson*, 60 F. Supp. 193, 194 (ED Mich. 1945), and the view of the commentators, *e. g.*, Anderson, *supra* n. 3, at 254; Clark, *supra* n. 3, at 17, was that tenancies by the entirety, like Texas homesteads, could not be sold to enforce the tax liability of one spouse. The House passed

cannot be subjected to levy and sale for the separate tax of one of them." Legislative History 177 (citations omitted).

The Report cites the leading cases, *Jones* v. *Kemp, supra,* and *Paddock* v. *Siemoneit, supra,* which held that the Oklahoma and Texas homestead rights block levy on or forced judicial sale of the homestead for the separate tax liability of one spouse. The ABA Report did not advocate changing what it presented as settled law. Instead, it suggested that a court could "declare, but not foreclose, the lien (so that litigable questions may be disposed of within the period of limitations)." Legislative History 177. The Report went on to suggest that a court could "make such order as may be necessary to protect the Government's interest during the joint lives" of the spouses. *Ibid.* In the Government's words, Congress thereafter refrained from implementing any change in the status of Texas homesteads.

[9] See Federal Tax Lien Act of 1966, Pub. L. 89–719, § 107(b), 80 Stat. 1140; Tax Reform Act of 1976, Pub. L. 94–455, §§ 1906(b)(13)(A) and 2004(f)(2), 90 Stat. 1834 and 1872; Economic Recovery Tax Act of 1981, Pub. L. 97–34, § 422(e)(8), 95 Stat. 316.

[10] The effect of tenancies by the entirety is to create an immunity from the tax collector far broader than that created by Texas homestead provisions. In addition to homestead property, "[b]usiness assets, personal property, and even money may be so held in some states." Plumb, 13 Tax L. Rev., at 262.

an amendment that would have extended the tax lien created by § 6321 expressly to the taxpayer's interest as tenant by the entirety. H. R. 8300, 83d Cong., 2d Sess., § 6321 (1954) (Code bill). The Senate removed the language, stating: "The deletion of the phrase is intended to continue the existing law." S. Rep. No. 1622, 83d Cong., 2d Sess., 575 (1954).

It is true, of course, that tenancies by the entirety were held to be immune from federal tax sales on a theory different from that applied to homestead property like Mrs. Rodgers'. See *ante,* at 703–704, n. 31. But it was established that both types of property interests precluded the Government from satisfying the tax debts of one spouse by selling the jointly owned property. In the absence of any evidence of congressional intent to the contrary, this deliberate choice to leave undisturbed the bar to tax enforcement created by a tenancy by the entirety [11] suggests that Congress did not object to the similar effect of the Texas homestead right, an effect consistent with principles basic to the common law of liens.

---

[11] The Court implies that the Senate's stated intention "to continue the existing law" may have indicated a view that existing law permitted sales of a tenancy by the entirety to satisfy a single spouse's tax debts. *Ante,* at 703–704, n. 31. This argument is difficult to understand, given the Court's apparent agreement that judicial interpretation of the tax lien provisions was unequivocally to the contrary. *Ante,* at 703, n. 31. Moreover, the Senate Report's suggestion that the amendment might not significantly have changed the law, see *ante,* at 704, n. 31, does not advance the Court's case. The amendment would have allowed the federal tax lien merely to *attach* to the interests in property of the delinquent spouse. Like Texas homestead property, however, a tenancy by the entirety usually vests the entire estate in both spouses, bars either spouse from disposing of it without the concurrence of the other, and prevents either spouse from destroying the other's survivorship rights. *United States* v. *Hutcherson,* 188 F. 2d 326, 329 (CA8 1951). Thus, even if the lien attached to the delinquent spouse's interest in the property by virtue of the amendment, the traditional rule that the lienholder gains only those property rights possessed by the debtor would have precluded a sale. See generally Plumb, 77 Yale L. J., at 637–638.

## B

Although disclaiming it as a basis for decision, the Court relies on *Mansfield* v. *Excelsior Refining Co.*, 135 U. S. 326, 339–341 (1890), to support its reading of § 7403. *Ante*, at 691–692, n. 17. In *Mansfield*, a tenant who operated a distillery on leased property fell delinquent in its taxes. The Government sought to sell by administrative levy the entire fee, not just the tenant's leasehold interest. The fee was owned by a third party, and the delinquent taxpayer's leasehold interest obviously did not give him the power to sell the fee. The *Mansfield* Court would not allow a sale by administrative levy, but suggested that on the facts of that case, the Government could seek a judicial sale of the entire property under the predecessor of § 7403. Focusing on just this portion of the *Mansfield* opinion, the Court now states that "[r]ead broadly, *Mansfield* is on 'all fours' with our holding today." *Ante*, at 692, n. 17.

To the contrary, *Mansfield* is not on "all fours" with today's holding, and indeed undermines it. In the same 1868 Act in which it passed the original predecessor to § 7403, Congress enacted a separate provision to ensure the collection of taxes from distillers. Section 8 of that Act required each distiller to own its distillery property in fee and free from liens. Alternatively, a distiller could file with the tax collector the fee owner's written consent granting a tax lien of the United States priority over all other claims to the property, and granting the United States full title in the property in case of forfeiture. Act of July 20, 1868, ch. 186, § 8, 15 Stat. 128.

The taxpayer's landlord in *Mansfield* had executed such a waiver, and the Court stated that "the vital question" was the waiver's effect. 135 U. S., at 338. Rejecting the Government's position, the Court held that the waiver did not permit sale of the property by administrative levy. The Court made clear, however, that its reading of the statute did

not render the waiver requirement useless. "By the waiver the government . . . acquired the right, by a suit [under the predecessor of § 7403], to have sold, under the decree of a court, not only the distiller's leasehold interest, but the fee in the premises." *Id.*, at 340.

Thus, the *Mansfield* Court considered the waiver to be a condition precedent to the Government's power, under the predecessor of § 7403, to sell the landlord's fee interest when the tenant was in default in its taxes. If § 7403 gives the Government this power without the necessity of a waiver—as the Court today holds—it seems unlikely that Congress would have considered it necessary, in the very Act in which it passed § 7403's predecessor, to require that a distiller either own the fee outright or obtain from its landlord advance authorization for a sale of the fee to satisfy the distiller's tax liabilities.[12] Outside the distillery context, Congress must have intended that the Government's power to force a sale of the fee would be no more extensive than that of the delinquent taxpayer.

---

[12] It is the Court that quotes out of context from *Mansfield.* The waiver provision of the 1868 Act ensured that all distillery property either would be owned in fee by the distiller or would be owned by a third party subject to a waiver of ownership rights in favor of the Government in the event of a default. The "general statement" on which the Court relies, see *ante*, at 692, n. 17, refers specifically to the application of § 7403's predecessor to the sale of distillery property: "In order to collect the taxes due from . . . the *distiller*, [the Government] might have instituted a suit in equity, to which not only the *distiller*, . . . but all persons . . . claiming any interest in, the premises could be made parties . . . ." 135 U. S., at 339 (emphasis supplied). Even viewed in isolation, this statement need not be read as applying outside the distillery context. On the next page of its opinion, the *Mansfield* Court resolved whatever doubt might have remained about the breadth of this passage. It stated that the waiver, *in addition* to giving the Government priority over the owner of the property, gave the Government the right, by a suit in equity, to sell the fee in the premises. *Id.*, at 340.

## C

The Court's "broad reading" of *Mansfield*'s holding reflects only the extraordinary breadth of its own. As read by the Court, *Mansfield* authorizes, without the consent of the owner of the fee, a judicial sale of a building should a tenant fail to pay his taxes, a judicial sale of a farm should the holder of an easement across it become delinquent,[13] or a judicial sale of a condominium or cooperative apartment house to satisfy the tax debt of any co-owner.[14] The Court imputes to Congress an intent to permit the sale of the farm or the building even though the fee owners have paid their taxes and even though, in signing a lease or conveying an easement, the fee owners did not surrender their indefeasible right to prevent the sale of their property.

Prior to 1936, moreover, the predecessor of § 7403(c) *required* a court at the Government's request to sell the prop-

---

[13] At oral argument, the Government admitted that its interpretation of §§ 6321 and 7403 would entitle it to seek the sale of residential property across which a neighbor, delinquent in his taxes, held an easement. Tr. of Oral Arg. 9–10. The Government indicated that it would exercise its discretion to sell just the easement "where there is a separate market" for it. *Id.*, at 9.

[14] Even the Internal Revenue Service does not take its approach to the statute this far. The Service has ruled that when a delinquent taxpayer owns a time-sharing condominium interest, "[t]he federal tax lien may be enforced against the delinquent taxpayer's interest but not against the condominium unit itself." Rev. Rul. 79–55, 1979–1 Cum. Bull. 400, 401. The Service apparently reads its own limitation into the statute's plain language: sale of property in which a delinquent taxpayer owns a partial interest is permitted only where "the property is not capable of being divided among the co-owners." *Ibid.*

Presumably, the Court would agree that it would be an abuse of discretion for a court to order a sale of an entire property capable of division among co-owners. See *ante*, at 709–711. If the Court is willing to read this limit into the statute, however, I fail to see how the Court can refuse to recognize a limit in the basic common-law proposition that the lienholder obtains no rights that the debtor did not have. See *United States* v. *Hershberger*, 475 F. 2d, at 679, 682.

erty in which the tax debtor had an interest. See *ante*, at 706–709. Thus, the Court's view attributes to Congress the incredible intention to *mandate* the sale of the entire property whenever the holder of an easement, a tenant, or one with a similarly minimal interest fails to pay a tax and the Government invokes its right to bring an action to enforce its lien. It is hardly surprising that counsel for the Government has been unable to cite a single instance before or after this Court's decision in *Mansfield* in which the Government, outside the context of the homestead cases, invoked § 7403 or its predecessors to assert a property right greater than the taxpayer himself could have asserted. Tr. of Oral Arg. 14–16. To abrogate the common-law rule that the tax collector gains only the property rights of the tax debtor leads to absurd results.

### III

Without direct evidence of congressional intent to contravene the traditional—and sensible—common-law rule, the Court advances three arguments purporting to lend indirect support for its construction of § 7403.

### A

First, the Court claims that its construction is consistent with the policy favoring "the prompt and certain collection of delinquent taxes." *Ante*, at 694. This rationale would support any exercise of governmental power to secure tax payments. Were there two equally plausible suppositions of congressional intent, this policy might counsel in favor of choosing the construction more favorable to the Government. But when one interpretation contravenes both traditional rules of law and the common sense and common values on which they are built, the fact that it favors the Government's interests cannot be dispositive.[15]

---

[15] Similarly important but general policies, coupled with broad statutory language, were insufficient to overcome the common-law rules in both *Sanges* and the § 1983 cases. See n. 5, *supra*.

Moreover, the Government's interest would not be compromised substantially by a rule permitting it to sell property only when the delinquent taxpayer could have done so. In this case, the delinquent taxpayer's homestead interest, it is assumed, gave him a "half-interest in the underlying ownership rights to the property being sold." *Ante*, at 699. An immediate forced sale of the entire property would yield for the Government no more than half the present value of the remainder interest, the residue left after the present values of the nondelinquent spouse's life estate and half-interest in the remainder are subtracted. As the Court notes, the Government can expect to receive only a small fraction of the proceeds. *Ibid.* An immediate sale of the delinquent taxpayer's future interest in the property might well command a commensurate price.

Alternatively, the Government could maintain its lien on the property until Mrs. Rodgers dies and then could force a sale. Because the delinquent taxpayer's estate retains a half-interest in the remainder, the Government would be entitled to half of the proceeds at that time. The Government's yield from this future sale, discounted to its present value, should not differ significantly from its yield under the Court's approach. The principal difference is that, following the common-law rule, Mrs. Rodgers' entitlement to live out her life on her homestead would be respected.

An approach consistent with the common law need not prejudice the Government's interest in the "certain" collection of taxes. Under § 7403(d),[16] the District Court has the power to appoint a receiver, who could supervise the property to protect the Government's interests while respecting Mrs. Rodgers' rights to possession and enjoyment. Plumb,

---

[16] Section 7403(d) provides:

"In any such proceeding, at the instance of the United States, the court may appoint a receiver to enforce the lien, or, upon certification by the Secretary during the pendency of such proceedings that it is in the public interest, may appoint a receiver with all the powers of a receiver in equity."

77 Yale L. J., at 638. Indeed, just such an approach was suggested by the American Bar Association's Committee on Federal Liens, 84 A. B. A. Rep. 645, 681–682 (1959), which drafted the tax lien amendments adopted in 1966. Legislative History 108–109 (statement of Laurens Williams).

## B

The Court also would support its construction by contrasting § 7403 with the more restrictive language of § 6331, the administrative tax levy provision. *Ante*, at 695–697. It is true that § 6331 permits the sale only of "property and rights to property . . . belonging to" the taxpayer, while § 7403 generally authorizes the sale of property in which the taxpayer has an interest. But the greater power conferred by § 7403 is needed to enable the Government to seek the sale of jointly owned property whenever the tax debtor's rights in the property would have permitted *him* to seek a forced sale. Section 7403 certainly permits the Government, in such circumstances, to seek partition of the property in federal, rather than state, court, to seek authority to sell the tax debtor's part or the whole, and, in the same proceeding, to have determined the entitlements of the various claimants, including competing lienholders, to the proceeds of the property sold. See generally Plumb, 77 Yale L. J., at 628–629. Absent the more expansive language of § 7403, this would not be possible. That language, however, does not manifest congressional intent to produce the extraordinary consequences yielded by the Court's interpretation.

## C

The Court also asserts that its construction of § 7403 is consistent with "the traditional powers of a taxing authority in an *in rem* enforcement proceeding," even if it is not consistent with the traditional rights of lienholders. *Ante*, at 694–695 and 702. This, with all respect, is not so. *In rem* tax enforcement proceedings never have been used to sell property

belonging to unindebted third parties in order to satisfy a tax delinquency unrelated to the property sold. As the Court recognizes, *ante*, at 694, such proceedings are brought to sell land in order to satisfy delinquent ad valorem taxes assessed on the land itself. 2 T. Cooley, Law of Taxation 866, 910 (3d ed. 1903). It is said that the land itself is liable for such taxes, and that conflicting ownership rights thus do not bar its sale. See *id.*, at 866–868; H. Black, Law of Tax Titles 296 (1888); W. Burroughs, Law of Taxation 346–349 (1877). The cases relied upon by the Court for the proposition that *in rem* tax proceedings extinguish the homestead rights of an unindebted spouse merely applied this rule. *Lucas* v. *Purdy*, 142 Iowa 359, 120 N. W. 1063 (1909); *Robbins* v. *Barron*, 32 Mich. 36 (1875); *Jones* v. *Devore*, 8 Ohio St. 430 (1858).

On the other hand, if the tax is assessed on an individual's separate interest in the land, rather than on the land itself, the tax debt is personal to the individual and "[n]othing more [than the individual's interest] . . . can become delinquent; nothing more can be sold." Black, *supra*, at 301; see R. Blackwell, On the Power to Sell Land 908, 920, 942 (5th ed. 1889); 2 Cooley, *supra*, at 870–871; Burroughs, *supra*, at 347. The real property interests of third parties cannot be sold through an *in rem* proceeding to satisfy a personal tax liability. The "traditional powers of a taxing authority" to sell the entire property and extinguish the interests of unindebted third parties thus are limited to collection of taxes assessed on the land itself, and have no application to delinquent taxes, like those at issue in these cases, assessed personally against one joint owner.[17]

---

[17] Congress was fully aware of this distinction in 1868. In 1863, Congress amended a tax statute, explicitly imposing a tax directly on land, and vesting title upon default "in the United States or in the purchasers at [a tax] sale, in fee simple," free and discharged from "all . . . claim[s] whatsoever." See *Turner* v. *Smith*, 14 Wall. 553, 554–555 (1872) (emphasis deleted). The Court distinguished between this tax, "clearly a direct tax on the land, and on all the estates, interests, and claims connected with or

Some States, it is true, have authorized by statute the sale of real property to satisfy the owner's tax debts, even where the delinquent taxes are unrelated to the property. See *Larimer County* v. *National State Bank of Boulder,* 11 Colo. 564 (1888); *Iowa Land Co.* v. *Douglas County,* 8 S. D. 491 (1896). The Court does not suggest, however, that jointly owned real property ever has been sold pursuant to such a statute when an unindebted co-owner has indefeasible rights therein. Indeed, the traditional distinction between taxes for which the land is liable and tax liabilities personal to the taxpayer would preclude such a sale. Thus, even if one purpose of § 7403's predecessor statute "was to obtain for the federal tax collector some of the advantages that many States enjoyed through *in rem* tax enforcement," *ante,* at 695, Congress would not have intended the result the Court reaches today. A state tax collector could not confiscate the indefeasible real property interests of a nondelinquent third party to satisfy the personal tax liability of a co-owner.[18]

---

growing out of the land," *id.,* at 563, and the tax authorized by the prior statute, which arguably was imposed merely "on the owner of the land, and levied on the interest of the owner in it." *Id.,* at 562. The Court held that these amendments made clear that Congress intended to permit the sale of all interests in the property upon default.

Congress did not include similar language in the predecessor statute to § 7403, enacted only five years later, presumably because it was aware that it authorized the sale of land to satisfy personal tax liabilities, rather than to collect direct taxes on the land. As the *Mansfield* case makes clear, *supra,* at 721–722, Congress knew how to gain the benefits of *in rem* proceedings in this context if it so desired: it could obtain a waiver from the owner of the fee, acquiring the right to sell the property regardless of ownership, and permitting a fee simple to vest in the United States, or in a purchaser at a tax sale, upon default.

[18] The Court also relies on certain cases "outside the context of *in rem* proceedings" upholding state statutes specifically authorizing enforcement of property taxation through the sale of all personalty in the delinquent taxpayer's possession, whether or not the taxpayer owns it. *Ante,* at 695, n. 19. The courts in these cases expressed considerable discomfort with such statutes, but deferred to the legislatures' explicit intention that owner-

## IV

The Court recognizes that Mrs. Rodgers has an indestructible property right under Texas law to use, possess, and enjoy her homestead during her lifetime, and that the delinquent taxpayer's property interests would not have enabled him to disturb that right against her will. *Ante*, at 685–686. The Court recognizes that Mrs. Rodgers has no outstanding tax liability and that the Government has no lien on Mrs. Rodgers' property or property rights. Because I conclude that Congress did not intend § 7403 to permit federal courts to grant property rights to the Government greater than those enjoyed by the tax debtor, I would hold that the Government may not sell Mrs. Rodgers' homestead without her consent. To the extent the Court holds to the contrary, I respectfully dissent.

## V

Mrs. Ingram's case, however, is materially different. Like her husband, Mrs. Ingram was liable for back taxes, and consequently the Government had a lien on her interests in property as well as on her husband's interests. Exercising both spouses' rights in the homestead, the Government is en-

---

ship was to be presumed from possession. See *Sears* v. *Cottrell*, 5 Mich. 251, 254–255 (1858); *id.*, at 257 (concurring opinion). Section 7403, in contrast, is not explicit on the issue before the Court. Moreover, these state statutes hardly could have provided a model for Congress; they did not affect real property, which was the sole subject of the predecessor statute to § 7403. See n. 4, *supra*. They simply created an irrebuttable presumption that one in possession of personal property was its owner, in order to avoid the fraud and collusion that inevitably would result from a contrary rule. See *Hersee* v. *Porter*, 100 N. Y. 403, 409–410, 3 N. E. 338, 339–340 (1885); *Sears* v. *Cottrell*, 5 Mich., at 266 (concurring opinion). Real property, which is immovable and subject to stringent recording requirements, does not pose these dangers and thus does not require similar measures.

*International Harvester Credit Corp.* v. *Goodrich*, 350 U. S. 537 (1956), relied upon *ante*, at 695, n. 19, is not relevant. There, the Court merely ratified a State's choice to give its tax lien priority over competing liens.

titled to force a sale, Plumb, 13 Tax L. Rev., at 263; see *Shambaugh* v. *Scofield*, 132 F. 2d 345 (CA5 1942), subject only to the discretion of the District Court. See *ante*, at 703–711. Second, when Mrs. Ingram and her former husband were divorced, the homestead became subject to partition under Texas law. See *ante*, at 685, n. 10. In Mrs. Ingram's case, therefore, I concur in the result.