UNITED STATES of America, plaintiff,

v.

Jack JEPSEN; Kris Jepsen; Karen Jepsen Makutenas; Arkansas Department of Finance & Administration; and Baxter County Assessor, Defendants.

No. Civ. 98–3066.

United States District Court,
W.D. Arkansas,
Harrison Division.

June 2, 2000.

Andrew T. Pribe, U.S. Dept. of Justice, Tax Division, Washington, DC, P.K. Holmes, III, Fort Smith, AR, for United States of America, plaintiff.

David Grant Bercaw, Ball & Mourton, Ltd., Fayetteville, AR, for Jack Jepsen, Kris Jepsen, Karen Jepsen Makutenas, defendants.

James E. Gresham, Gresham & Kirkpatrick, Harrison, AR, for First Federal Savings & Loan of Harrison, defendant.

Mark S. Ferguson, Revenue Legal Counsel, Little Rock, AR, for Arkansas Department of Finance and Administration, defendant.

### *MEMORANDUM OPINION*

H. FRANKLIN WATERS, District Judge.

The United States filed this case on August 27, 1998. The complaint contained three counts: in count one, the United States seeks to foreclose on a lien against a real estate mortgage held by Jack Jepsen on property located in Arkansas; in count two, the government alternatively seeks to set aside as a fraudulent conveyance a release of the mortgage on the Arkansas property; and in count three, the government sought to reduce to judgment a responsible person assessment made pursuant to 26 U.S.C. § 6672.

By memorandum opinion and order entered on April 12, 2000, we granted the United States' motion for summary judgment on count three. By memorandum opinion and order entered on May 17, 2000, we denied the parties' cross-motions for summary judgment on count one and the United States' motion for summary judgment on count two.

In that opinion, we held: (1) there was an issue of fact as to whether or not the transfer of the property was by sale or gift; (2) that Illinois law applied to the note and Jack's property interest in the note and mortgage had not expired before the government filed this suit: (3) there was a question of fact as to whether Jack acted with the requisite intent under Arkansas' Fraudulent Conveyance Act; and (4) defendants had waived the statute of limitations defense on the Fraudulent Conveyance claim; and in any event, the government was not bound by the statute of limitations contained in the Arkansas Act.

On May 24, 2000, the claims asserted in counts one and two were tried to the court. At the conclusion of the evidence, the court informed the parties they could have until June 2, 2000, to submit amended proposed findings of fact and conclusions of law, if they so desired. The court has been advised that neither party wishes to submit amended findings of fact or conclusions of law. Accordingly, this matter is ready for decision. The following shall constitute the court's findings of fact and conclusions of law as contemplated by Rule 52 of the Federal Rules of Civil Procedure.

### I. FINDINGS OF FACT.

1. Jack Jepsen (Jack) is the father of Kris Jepsen (Kris) and Karen Jepsen Makutenas Miller (Karen). During 1989, Karen was married to Michael Makutenas.

2. For some years prior to and including 1989, Jack owned property located in Baxter County, Arkansas, described as: Lot 2 of Mallard Point Home Sites. The property consists of approximately two acres of land with a 1200 to 1400 square foot house on it. The property was used as a vacation home by the family.

3. Jack first began thinking about conveying the property to his children in 1983

when he was going through a divorce. At the time, he testified he was considering giving them the property.

4. In 1986, after several tragic events including the death of one of his children, Kurt, and a serious injury, Jack began once again to consider conveying the property to his children. However, no steps were taken to transfer the property.

5. Over the next several years Jack considered either selling Kris and Karen the property or giving it to them.

6. On August 15, 1989, Jack executed a warranty deed conveying the Mallard Point property to Kris and Karen.

7. On August 15, 1989, Kris and Karen executed a promissory note in the amount of $95,000 in favor of Jack. The note bore interest at the rate of 9½% per annum with interest payable on each anniversary date and the entire principal due and payable on August 15, 1992. Only a photostatic copy of the promissory note is known to exist.

8. The promissory note was secured by a real estate mortgage on the Mallard Point property executed by Kris and Karen that same day.

9. At the trial, both Kris and Karen testified they had no recollection of executing the note or mortgage. Jack testified he had started to sell Kris and Karen the property in 1989 but changed his mind and decided to give it to them.

10. However, Jack also offered contradictory testimony as to his recollection of the transaction. First, he testified he was unaware of the existence of the note and mortgage until he was asked in 1995 to release the mortgage in 1995. Then, he testified he recalled receiving the note and mortgage but intended to "do away" with them but that his wishes in this regard were apparently not carried out by Robert Bailie, Jepsen of Illinois' chief financial officer.

11. George Carberry, an Indiana attorney, who acted as Jack's business lawyer, prepared the mortgage. Carberry presently has no specific recollection of preparing the real estate mortgage or any related documents. All of Carberry's firm records pertaining to Jack have been destroyed as part of the firm's standard business practice.

12. The warranty deed and mortgage were notarized by Janet Quigley, an employee of Jepsen of Illinois. The documents were executed in DuPage County, Illinois.

13. On August 15, 1989, Kris delivered a check drawn on his New Jersey National Bank account in the amount of $10,000 to Jack with the notation: "deposit Arkansas." This check was intended to be a down payment on the purchase of the Arkansas property. The check would not have cleared the bank had Jack attempted to cash the check.

14. On August 15, 1989, Karen and her husband delivered a check drawn on her West Suburban Bank of Darien, Illinois, account in the amount of $10,000 to Jack. The check was intended to be a down payment on the purchase of the Arkansas property. The check would not have cleared the bank had Jack attempted to cash the check.

15. On October 12, 1989, the deed and real estate mortgage were recorded in the land records of the Circuit Clerk and Ex–Officio Recorder of Baxter County, Arkansas, as instrument number 5356–89.

16. On October 19, 1989, Carberry wrote to Robert Bailie, vice president of finance at Jepsen of Illinois. The letter stated: "Enclosed are the original, recorded warranty deed and real estate mortgage relative to Jack's sale of the Arkansas real estate to Kris and Karen. These documents should be kept along with Jack's other real estate documents. I am also returning the original promissory note which Jack should keep. If you have any questions, please call."

17. Bailie could not recall the specifics of the transaction but testified that he would not have taken steps to transfer the property on his own. In fact, if it had

been up to him, Bailie would have rather transferred the property to the Internal Revenue Service to pay down the debt owed or to generate cash for the business. *Bailie Deposition* at 23–25.

18. On December 26, 1989, Jack sent both Kris and Karen letters returning their $10,000 checks. The letters stated: "I have decided to give you the down payment required on the purchase of the Arkansas property. Accordingly, I am returning your check in the amount of $10,000."

19. After August of 1989, Kris paid all taxes and expenses on the Mallard Point property. During periods when the property was used as rental property, Kris also received all rental income from the property.

20. Jepsen of Illinois, Inc., was an Indiana corporation which operated from 1982 until its closure in 1993. Jack owned 90% of the stock of Jepsen of Illinois and was its president and also served as a director of the corporation.

21. From the first quarter of 1992 through the first quarter of 1993, Jepsen of Illinois failed to pay over to the government $214,263.08 of the trust fund portion of federal withholding taxes.

22. On April 25, 1994, an assessment of the trust fund recovery penalty in the amount of $214,263.08 was made against Jack as a responsible person under 26 U.S.C. § 6672.

23. On March 21, 1995, Jack executed a release of the mortgage on the Mallard Point property. Jack received no consideration for the release of the mortgage.

24. Jack never received any payments on the note and received no payment of any kind from his children for the Mallard Point property. Both Kris and Karen testified they never understood that any payments were to be made on the property.

25. There are no documents indicating the conveyance of the Mallard Point property was by gift.

26. On April 17, 1995, Karen executed a quitclaim deed conveying all of her interest in the Mallard Point property to Kris.

27. In April of 1995, Kris obtained a loan using the Mallard Point property as collateral. Fifteen thousand dollars of the loan proceeds were invested in a company the family was attempting to launch. Jack, although involved in running the company, was not an investor in the company and did not draw a salary.

28. On April 25, 1995, the release and the quitclaim deed were recorded in the Baxter County, Arkansas, land records respectively as instrument numbers 2990–95 and 2991–95.

29. In 1995, Jack's only asset was a parcel of real property located in Phoenix, Arizona, which had a market value of $1,200,000 but was pledged as collateral to secure a $3,000,000 debt. Jack was not current on the payments on this debt. Jack also had a judgment entered against him on which he had made no payments and he was not current on his credit card payments. In fact, when Jack executed a collection information statement for the Internal Revenue Service in July of 1995, he indicated he had no monthly income, no assets other than the Arizona property, and his necessary monthly living expenses exceeded his net income by $1,690.

30. After the transfer of the property to Kris and Karen, Jack continued to use the Mallard Point property although on a less frequent basis than before. Kris was unaware of any occasion on which Jack used the property after August of 1989 without Kris having knowledge of it.

31. The outstanding balance of a $95,000 loan at 9½% interest compounded annually from August 15, 1989, to May 22, 2000, is $252,650.40.

## II. CONCLUSIONS OF LAW.

1. The court has jurisdiction over this matter pursuant to 28 U.S.C. § § 1340 and 1345 and 26 U.S.C. § 7402. Venue is

proper in this judicial district pursuant to 28 U.S.C. § 1391(b).

■ 2. The essential elements of a valid inter vivos gift are: 1) the donor was of sound mind; 2) an actual delivery of the property took place; 3) the donor clearly intended to make an immediate, present, and final gift; 4) the donor unconditionally released all future dominion and control over the property; and 5) the donee accepted the gift. *O'Fallon v. O'Fallon,* 341 Ark. 138, 14 S.W.3d 506 (2000).

■ "These elements must be established by clear and convincing proof in order for an inter vivos gift to be sustained." *Bishop v. Bishop,* 60 Ark.App. 164, 169, 961 S.W.2d 770 (1998) (citation omitted). "Clear and convincing evidence is evidence by a credible witness whose memory of the facts about which he testifies is distinct, whose narration of the details is exact and in due order, and whose testimony is so direct, weighty, and convincing as to enable the fact-finder to come to a clear conviction, without hesitance, of the truth of the facts related." *Id.* (citations omitted).

■ While "[t]he rule in Arkansas is that the law presumes a gift when the donor registers legal title in a family member's name," *Perrin v. Perrin,* 9 Ark.App. 170, 175–76, 656 S.W.2d 245 (1983), this presumption is overcome in this case by the existence of a note and mortgage signed by Kris and Karen. The testimony offered by Jack, Kris, and Karen as to the transfer of the Mallard Point property is anything but clear. The only point clearly agreed upon by all three was that the property would one day be conveyed to Kris and Karen either by sale or gift. No one could remember the specifics of the actual conveyance and all three denied having any recollection of the execution of the note and mortgage. Kris and Karen, however, admitted that the signatures on the note and mortgage were theirs.

Jack's testimony that he intended to give them the property and thought this was accomplished when he returned the checks in December of 1989 is belied by the wording of his letters returning the checks. The letters limit the "gift" to the down payment on the property and refer to the property transfer as a "purchase." Clearly the letters do not indicate his intent to "give" Kris and Karen the property.

The deed, mortgage, and promissory note were all executed the same day and clearly establish that the transfer of the property was by sale. This is further evidenced by the fact that Kris and Karen each giving Jack a $10,000 check as a down payment on the property. We conclude the August 15, 1989, transfer of the property was a sale by Jack to his children, Kris and Karen. No "gift" of the property occurred prior to the federal tax assessment.

■ 3. A lien in favor of the United States arose on the date of assessment, April 25, 1994, with respect to all Jack's property and his rights to property. *See* 26 U.S.C. § § 6321, 6322. State law governs the initial inquiry into "what rights the taxpayer has in the property the Government seeks to reach." *Drye v. United States,* —— U.S. ——, 120 S.Ct. 474, 481, 145 L.Ed.2d 466 (1999). Then we look to "federal law to determine whether the taxpayer's state-delineated rights qualify as 'property' or 'rights to property' within the compass of the federal tax lien legislation." *Id. See also United States v. Rodgers,* 461 U.S. 677, 683, 103 S.Ct. 2132, 2137, 76 L.Ed.2d 236 (1983); *United States v. Green,* 201 F.3d 251, 253 (3d Cir.2000); *United States v. Stonehill,* 83 F.3d 1156, 1159 (9th Cir.1996). The government acquires by its lien "no greater right to property than the taxpayer himself has at the time the tax lien arises." *St. Louis Union Trust Co. v. United States,* 617 F.2d 1293, 1301 (8th Cir.1980). *See also Gardner v. United States,* 34 F.3d 985 (10th Cir.1994) ("the tax collector not only steps into the taxpayer's shoes but must go barefoot if the shoes wear out," *quoting* 4 Boris Bittker, *Federal Taxation of Income, Estates and Gifts* P 111.5.4 (1981)).

4. At the time the lien arose, Jack's property interest was his right to file a cause of action to collect on the note or to foreclose on the property. *See United States v. Goldberg,* 362 F.2d 575, 577 (3d Cir.1966) ("The federal tax lien attached to the note and mortgage when the taxes were assessed.") Jack had a personal property interest in the choses in action.

5. The note was executed in Illinois and Arkansas law dictates application of the Illinois statute of limitations to this debt. *Cooper v. Cherokee Village Development Co.,* 236 Ark. 37, 364 S.W.2d 158 (1963). Under Illinois law, Jack had to file suit within ten years of August 15, 1992, the maturity date of the note. Ill.Rev. Stat. Ch. 110 ¶ 13–206 (1989); *Brown v. Charlestowne Group, Ltd.,* 221 Ill.App.3d 44, 163 Ill.Dec. 677, 581 N.E.2d 831, 832 (1991) The government's cause of action is therefore not barred by the applicable statute of limitations.

6. Having found that no valid inter vivos gift occurred, we need not determine if Jack's release of the mortgage constituted a fraudulent conveyance within the meaning of the Arkansas Fraudulent Transfer Act, Ark.Code Ann. §§ 4–59–201 *et seq.* (Repl.1996). This is true because once a tax liability has attached the taxpayer cannot avoid or defeat liability by disclaiming or renouncing interest in the property or transferring, conveying, or releasing the interest. *Drye,* 120 S.Ct. at 482–83 (tax lien could not be defeated by disclaiming interest in an estate); *Rodgers,* 103 S.Ct. at 2141 n. 16; *United States v. Goldberg,* 362 F.2d 575, 577 (3d Cir.1966) ("[S] ubsequent transfer or an interest in a note and mortgage did not displace or diminish the tax lien."). Jack could not defeat the lien of the United States by executing a release of the mortgage.

### III. CONCLUSION

Accordingly, we find the United States of America is entitled to judgment in its favor on count one of the complaint. We find it unnecessary to rule on the alternative claim of the United States contained in count two of the complaint.

The United States' tax lien attached on the date of assessment, April 25, 1994, to Jack Jepsen's interest in the note and mortgage on the Mallard Point property. The mortgage release executed on March 21, 1995, did not defeat the lien of the United States and is invalid so far as the United States of America is concerned. The tax lien of the United States is foreclosed.

The United States is directed to provide the court with an appropriate precedent for judgment **by the close of business on June 15, 2000.**