**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 14-4237, 15-1247, 15-3433 & 15-3469

_____

UNITED STATES OF AMERICA,
Appellant in 14-4237, 15-
1247 & 15-3433

v.

GARY S. CARDACI; BEVERLY M. CARDACI;
ED WOOD CUSTOM DRYWALL, INC.;
LEWIS J. MOREY; TRI-COUNTY BUILDING SUPPLIES,
INC.; BRANDI L. WATSON

Gary S. Cardaci; Beverly M. Cardaci,
Appellants in 15-3469

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 1-12-cv-05402)
District Judge: Hon. Jerome B. Simandle

_____

Argued
November 3, 2016

Before: JORDAN, GREENAWAY, JR., and RENDELL, *Circuit Judges*.

(Opinion Filed: May 8, 2017)

_____

Julie C. Avetta   [ARGUED]
Michael J. Haungs
Curtis C. Pett
United States Department of Justice
  Tax Division
950 Pennsylvania Avenue, N.W.
P.O. Box 502
Washington, DC 20044
        *Counsel for Appellant*

Anthony P. Monzo   [ARGUED]
Monzo Catanese Hillegass
211 Bayberry Drive
Suite 2A
Cape May, NJ 08210
        *Counsel for Appellees*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

The government has been trying to collect unpaid taxes assessed against Gary S. Cardaci, and, to that end, it sought the judicial sale of the home he owns in New Jersey with his wife, Beverly.  The United States District Court for

2

the District of New Jersey concluded that a forced sale would be inequitable and instead ordered that Mr. Cardaci make monthly rent payments to the government. Unhappy with that outcome, the government has appealed. The Cardacis, who should have been delighted with the decision, have filed a cross appeal to challenge both the requirement to pay rent and the monthly rental amount. Even though no sale was ordered, the Cardacis also question the authority of the District Court to order a sale. We confirm the District Court's authority to consider whether the Cardacis' property should be subject to a forced sale but will vacate and remand for recalculation of Mr. and Mrs. Cardacis' respective interests in the property and reconsideration of the equitable factors weighing for and against a sale.[1]

## I.    BACKGROUND

### A.    Factual Background

Mr. Cardaci was the owner of Holly Beach Construction Company ("Holly Beach" or "the Company").

---

[1] Because we remand for the District Court to consider again whether to order a sale of the property, we do not address in detail the decision to order rental payments. We note, however, that Federal Rule of Civil Procedure 54(c) instructs that a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Therefore, on remand, the District Court is not precluded from considering the imposition of rental payments as an alternative remedy simply because the government "has not demanded that relief in its pleadings." *Id.*

In 2000 and 2001, the business began to fail, and, in an effort to shore it up, Mr. Cardaci used approximately $49,600 in taxes withheld from the wages of his employees to pay suppliers and wages rather than payroll taxes. During that two-year period, Mr. Cardaci took approximately $20,000 in salary from Holly Beach. He used that income to support his family, including making mortgage payments and paying private school tuition for one of his sons.

The Company eventually folded and Mr. Cardaci tried unsuccessfully to start other businesses. He has not had a regular income since 2009. On top of those financial frustrations, he also has medical problems that limit his employment options. Since 2005, Beverly Cardaci has been the primary wage earner in the family. She earns about $62,000 a year as a public school teacher.

The Cardacis own property in Cape May County, New Jersey, that they purchased in 1978 as their home. They claim no dependents now, but two of their adult children live in the house with them at least part of each year. Their son Garrett lives there full time with his wife and three children. Garrett earns approximately $37,600 a year. He emerged from bankruptcy a year and a half before the bench trial in this case. He and his wife do not pay rent. Another son, Robert, lives in the house during the summer while he does seasonal work. He earns just under $4,000 a year.

The Cardacis' house has been their marital domicile continuously since they bought it, and the only mortgage on the property was paid in full in 2009. Mr. Cardaci made the majority of the monthly mortgage payments from 1978 through 2005, but, after that, Mrs. Cardaci was the sole payor.

4

The District Court determined that the house has a fair market value of $150,500. If the house were put to a forced sale, the government would set the minimum bid at 60 percent of the assessed value, which is $90,300.

At the time of the District Court's order, Mr. Cardaci was fifty-eight and Mrs. Cardaci was sixty-two. Neither party submitted evidence of the Cardacis' life expectancies, so the District Court, using the Social Security Administration's Actuarial Life Table, calculated the expectancies on the assumption that they were the same.

### B.    Procedural Background

In August 2012, the government brought this action to reduce to judgment federal tax assessments against Mr. Cardaci and to force the sale of the Cardaci home.[2] It sought to collect half of the proceeds to pay for Mr. Cardaci's tax liability and to distribute the remainder to Mrs. Cardaci. Upon the government's motion for summary judgment, the District Court, recognizing that Mr. Cardaci owed $80,083.87 plus interest and that the government had a valid lien on the Cardaci property, granted partial summary judgment to that effect. The Court also held that the suit was timely because an assessment was first made in 2002, and the suit was

_____

[2] The IRS also sought to recover back taxes from Mr. Cardaci's partner, Lewis J. Morey, and, in addition, it sued a drywall company and a building supply company that might have had an interest in the Cardaci property. Neither of those two companies, nor Mr. Morey, appeared before the District Court, and default judgments were entered against them.

5

brought within 10 years of that assessment. The Court did not, however, grant summary judgment with regard to the request to foreclose on the property.

Instead, the District Court determined that it had "limited discretion" to order an alternative remedy instead of a foreclosure sale. *United States v. Cardaci*, No. CIV. 12-5402 (JBS), 2014 WL 7524981, at *6 (D.N.J. Aug. 21, 2014). It noted that federal law does authorize such a sale and that New Jersey state law treats marital property as at least occasionally subject to partition, so the Court recognized that it could order a sale of the property, despite Mrs. Cardaci's interest in the property and her objection to foreclosure. But it decided that additional factual development at a trial would be needed before it could properly weigh the equities and determine whether foreclosure was proper.

After a two-day bench trial, the Court issued a judgment based on its consideration of the equitable factors set out in the Supreme Court's decision in *United States v. Rodgers*, 461 U.S. 677, 710-11 (1983). The District Court examined: (1) "the extent to which the [g]overnment's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes;" (2) whether Mrs. Cardaci had "a legally recognized expectation that [the] separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors;" (3) the likely prejudice to Mrs. Cardaci "in personal dislocation costs and … practical undercompensation;" and (4) "the relative character and value of the non-liable and liable interests held in the property[.]" *Rodgers*, 461 U.S. at 710-11. It also considered additional equitable factors such as the impact a forced sale would have

6

on other non-liable parties. Ultimately, the Court concluded that it would be inequitable to force the sale of the property.

That conclusion was based in some measure on the Court's method of valuing Mr. and Mrs. Cardacis' respective interests in their home. In calculating those interests, the Court refused to find them equal. It determined that Mrs. Cardaci's interest in the property, in the event of a forced sale, would be eighty-six percent, because she "owns an undivided one-half interest in the whole of the property, plus a right of survivorship." *Cardaci*, 2014 WL 7524981, at *9. Using life estate interest tables published by the Health Care Financing Administration in the New Jersey Medicaid Manual, the Court decided that Mrs. Cardaci's life estate interest was worth approximately seventy-two percent of the value of her interest in the property. The Court then added that life estate value (seventy-two percent times the fifty percent value of her interest, to equal thirty-six percent of the value of the property) to her one-half survivorship interest and concluded that she had an eighty-six percent interest in the value of the property, leaving the government to recover only fourteen percent of the proceeds from a forced sale.[3] Based on that calculation and consideration of the equitable factors from *Rodgers*, the Court found that "[t]he equities of this case warrant the exercise of the Court's 'very limited discretion not to order a sale.'" *Id.* at *17 (citation omitted). It therefore fixed an imputed monthly rental value of $1,500

---

[3] There are problems with the District Court's calculations that we describe *infra* at n.8 and accompanying text.

7

for the property and ordered Mr. Cardaci to pay half of that value to the IRS each month.[4]

Shortly after the final judgment was entered, the Cardacis filed a motion for reconsideration under Fed. R. Civ. P. 59(e). They argued that the imputed rental value was inaccurate and, in support, submitted declarations from two different realtors. Concluding that such evidence should have been presented at trial, the District Court refused to reconsider its original judgment.

Mr. Cardaci quickly defaulted on his monthly payment obligation. He also failed to set up an automatic debit payment system as required by the District Court, and he failed to provide proof of homeowner's insurance up to the balance of the tax obligation, as likewise required. He has not made any of the required payments and has not sought a stay of execution of judgment during the pendency of this appeal.

---

[4] The IRS also sought an equitable lien on the entire property to remain attached in case Mr. Cardaci predeceases Mrs. Cardaci. The Court refused to grant such a lien, concluding that the tax obligation would no longer attach to the property upon Mr. Cardaci's death. To the extent the government seeks to challenge that decision on appeal, we note that, when a delinquent-taxpayer spouse dies, a federal tax lien on property held in a tenancy by the entirety by a husband and wife is extinguished and "the surviving non-liable spouse takes the property unencumbered by the federal tax lien." Internal Revenue Serv., Notice 2003-60, Collection Issues Related to Entireties Property (2003), 2003 WL 22100950 (2003).

8

The government filed a timely notice of appeal, as did the Cardacis.[5]

## II.  DISCUSSION[6]

### A.  Authority of the District Court to Order a Sale

At the outset, we address the Cardacis' argument that the District Court lacked the authority to even consider ordering a sale of marital property held in tenancy by the entirety.  It is undisputed that, under New Jersey law, that is the character of the Cardacis' ownership interest.  It seems

---

[5] The government initially filed a notice of appeal before the District Court judgment became final, which was docketed as No. 14-4237.  After the District Court entered a final judgment as to the Cardacis, the government again appealed, and that appeal was docketed as No. 15-1247.  Although the judgment was final as to the Cardacis, it did not resolve all claims against all parties because Mr. Cardaci's business partner, Mr. Morey, remained.  (*See supra* n.2.)  Default judgment was entered against him on August 13, 2015, which resolved all remaining claims as to all parties.  The United States and the Cardacis each filed a timely notice of appeal from that final judgment, Case Nos. 15-3433 and 15-3469, respectively.  All four appeals have been consolidated.

[6] The District Court had jurisdiction under 26 U.S.C. § 7402 and 28 U.S.C. §§ 1331, 1340 and 1345.  We have jurisdiction pursuant to 28 U.S.C. § 1291.

9

obvious, then, that they have rights that qualify as "property" subject to the federal tax lien statute, 26 U.S.C. § 6321. But the Cardacis argue that their property is not subject to a foreclosure sale because it is protected by a New Jersey statute, N.J.S.A. § 46:3-17.4.

There are at least two flaws with their argument. First, that particular New Jersey statute is not applicable to the Cardacis. It was updated nearly thirty years ago by an amendment effective January 5, 1988, that includes the following language: "This act shall take effect on the 90th day after enactment and shall be applicable to all tenancies by entireties which are created on or after the effective date of this act." 1987 N.J. Laws 1661. Therefore, by its terms, the statute applies only to tenancies by the entirety created on or after April 4, 1988. The Cardacis purchased the property at issue in 1978. Thus, the amended and more protective version of the New Jersey statute does not apply, and we are required to "consider the present matter under common-law principles without reference to N.J.S.A. 46:3-17.4." *Freda v. Commercial Tr. Co. of N.J.*, 570 A.2d 409, 411 (N.J. 1990).

The second and more fundamental flaw in the Cardacis' argument is that, regardless of the applicability of New Jersey statutory or common law, state law must give way to the supremacy of federal law. In *United States v. Craft*, 535 U.S. 274 (2002), the Supreme Court made clear that "[s]tate law determines only which sticks are in a person's bundle [of property rights]. Whether those sticks qualify as 'property' for purposes of the federal tax lien statute is a question of federal law." *Craft*, 535 U.S. at 278-79. Under federal law, an "interest in … entireties property constitute[s] 'property' or 'rights to property' for the purposes

10

of the federal tax lien statute." *Id.* at 288. State-created exemptions are swept aside by the Supremacy Clause of the Constitution, which "is as potent in its application to innocent bystanders as in its application to delinquent debtors." *Rodgers*, 461 U.S. at 701. Therefore, the District Court was correct to hold that the marital home constitutes "property" subject to the federal tax lien statute. *Craft*, 535 U.S. at 288; *see also Popky v. United States*, 419 F.3d 242, 244 (3d Cir. 2005) (holding that rights to marital property are "property" for federal tax purposes when they include "the right to use the property, to receive income produced by it, and to exclude others from it" (quoting *Craft*, 535 U.S. at 283)).

## B. Analysis of the *Rodgers* Factors

Since the Cardacis' marital home is fair game under federal tax law, it can indeed be disposed of by a forced sale under 26 U.S.C. § 7403(c). But that statutory subsection provides that a court "*may* decree a sale of such property," the word "may" necessarily implying a degree of discretion. 26 U.S.C. § 7403(c) (emphasis added). In *United States v. Rodgers*, the Supreme Court said as much, concluding "that § 7403 does not require a district court to authorize a forced sale under absolutely all circumstances, and that some limited room is left in the statute for the exercise of reasoned discretion." 461 U.S. at 706. *Rodgers* directs that courts must order a sale of the property to satisfy a tax lien, unless, in light of common sense or special circumstances, it determines that a sale would be inequitable. *Id.* at 711. That determination is to be guided by four non-exhaustive factors. *Id.* at 710-11.

11

"First, a court should consider the extent to which the [g]overnment's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes." *Id.* at 710. "Second, a court should consider whether the third party with a non-liable separate interest in the property would, in the normal course of events (leaving aside § 7403 and eminent domain proceedings, of course), have a legally recognized expectation that that separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors." *Id.* at 710-711. "Third, a court should consider the likely prejudice to the third party, both in personal dislocation costs and in . . . practical undercompensation[.]" *Id.* at 711. "Fourth, a court should consider the relative character and value of the non-liable and liable interests held in the property[.]" *Id.* Those factors come with the caution that, because they do not "constitute an exhaustive list," they should not "be used as a 'mechanical checklist' to the exclusion of common sense and consideration of special circumstances." *Id.* At the same time, however, "the limited discretion accorded by § 7403 should be exercised rigorously and sparingly, keeping in mind the [g]overnment's paramount interest in prompt and certain collection of delinquent taxes." *Id.*

The government argues that the District Court here abused its discretion in analyzing the *Rodgers* factors and then erred in concluding that the Cardacis' home should not be sold. We agree that the District Court erred in its analysis of the *Rodgers* factors but will decline the government's invitation to definitively reweigh the factors ourselves, and, instead, we will remand for the District Court to recalculate the Cardacis' property interests and again engage in a thorough analysis of the equitable factors set forth in

12

*Rodgers*.  To assist in that process, we make the following observations.[7]

### 1. *The Prejudice to the Government Resulting from a Partial Sale*

The first *Rodgers* factor directs a court to "consider the extent to which the [g]overnment's financial interests would be prejudiced if it were relegated to a forced sale of the partial interest actually liable for the delinquent taxes."  *Id.* at 710.  In this case, the District Court concluded that that factor weighed in the government's favor "only slightly" because a sale of Mr. Cardaci's interest would provide little value, while requiring Mr. Cardaci to pay rental payments to the government was "likely to produce much greater collection of taxes to the [g]overnment compared with the amount likely to be obtained from a foreclosure sale of [the] entire property." *Cardaci*, 2014 WL 7524981, at *9.  We agree with that evaluation of what might be gained by trying to sell Mr. Cardaci's interest in the home, but taking into account what might be gained from rental payments was not a sound approach in considering this factor.  The focus should solely be on determining whether the government would be adequately compensated by a partial sale of the taxpayer's interest or whether a sale of the entire property is necessary to vindicate the government's interest.  Rental payments are not

---

[7] In explaining the implementation of the factors, we suggest how some of them may be assessed, but we do not consider them together to determine the result of a weighing of the equities.  In other words, we have high confidence in the District Court and are not ruling on how the weighing process should ultimately come out.

the equivalent of a partial sale and are not relevant to the contrast between a partial and a total sale.

An analysis of the first factor boils down to the idea that, "the higher the expected market price [of a partial interest], the less the prejudice, and the less weighty the [g]overnment's interest in going ahead with a sale of the entire property." *Rodgers*, 461 U.S. at 710. When there is no market for a partial interest in the property, this factor will weigh significantly in favor of a forced sale. *See id.* Because there is no real market for one spouse's interest in a marital home held in a tenancy by the entirety (the sale of which would leave the purchaser as a tenant in common with the remaining spouse), this factor weighs in favor of a forced sale of the Cardaci home.

### 2. The Non-Liable Party's Legally Recognized Expectation in the Property

The second factor directs a court to "consider whether the third party with a non-liable separate interest in the property would, in the normal course of events[,] . . . have a legally recognized expectation that that separate property would not be subject to forced sale by the delinquent taxpayer or his or her creditors." *Id.* 710-11. Consideration of that expectation requires reference to the protections afforded by state law. *See id.* at 711 (looking to the protections afforded by Texas homestead laws). The District Court found that, because New Jersey law provides special protection for a spouse's interest in marital property, Mrs. Cardaci would have expected that her property would be free from foreclosure based on her husband's tax obligations. According to the government, however, when the District

14

Court looked to New Jersey state law, it relied upon a statute that is "facially inapplicable" and "gave short shrift to the unusually weak protections provided by the New Jersey tenancy by the entirety[.]" (Opening Br. at 56.)

In determining the effect of New Jersey law on Mrs. Cardaci's expectations, the Court relied, in part, on § 46:3-17.4 of New Jersey's statutory code. But, as already noted, that law is only applicable to "tenancies by entireties which are created on or after the effective date of th[e] act[,]" namely January 5, 1988. 1987 N.J. Laws 1661. The Cardacis' property was purchased ten years earlier, in 1978. Therefore, the government is correct that § 46:3-17.4 is inapplicable and, on remand, the District Court should "consider the present matter under common-law principles without reference to [it]." *Freda*, 570 A.2d at 411.

The government also takes issue with what it characterizes as the District Court's failure to recognize that New Jersey provides weak protections for marital property held in a tenancy by the entirety. The expectation of the non-liable spouse is a matter of degree, because state laws afford varying levels of protection. *Rodgers*, 461 U.S. at 711. In *Freda v. Commercial Trust Co. of New Jersey*, the New Jersey Supreme Court declined to follow precedent from Pennsylvania, Florida, and Georgia because the protections for non-liable spouses under New Jersey common law are not as strong. 570 A.2d at 413. Unlike in those states, spouses in New Jersey own separate interests that can be reached by their individual creditors, so that "the interest of one tenant by the entirety is subject to liens on that tenant's interest." *Id*. Nonetheless, the *Freda* court also recognized that "[t]enancies by the entirety … survive as a means of protecting marital assets during coverture and as security for

15

one spouse on the death of the other," and such protection "is particularly compelling when the asset is the family home." *Id.* at 414 (citation omitted).

The most recent case from the New Jersey Supreme Court addressing common law rights and the protection of a person's property from a spouse's creditors – although rendered in the context of partition – seemed to focus on the equities, without announcing a clear legal right. The Court said that, "when the creditor's interest in the [marital] dwelling is weighed against that of the debtor's family, equitable principles persuade us that the creditor should not, as of right, be granted [partition] at the cost of dispossessing the family of its home." *Newman v. Chase*, 359 A.2d 474, 480 (N.J. 1976).

Consideration of the legally recognized expectations of the nonliable spouse is thus "amenable to considerations of degree." *Rodgers*, 461 U.S. at 711. It seems here that it may not weigh as fully against a forced sale as it would in a more protective state, but it also may not weigh in favor of a sale either, as New Jersey law may still discourage selling a family home to pay a creditor, depending on the equities. *See Newman*, 359 A.2d at 480. On remand, the District Court must, of course, rely on applicable New Jersey law in discerning the strength of Mrs. Cardaci's legally recognized expectations, given the facts of this case.

### 3. The Likely Prejudice to the Third Party

The third factor directs a court to "consider the likely prejudice to the third party, both in personal dislocation costs and in . . . practical undercompensation[.]" *Rodgers*, 461 U.S. at 711. The District Court focused its inquiry on the first

16

aspect of this factor – personal dislocation costs. It concluded that the factor is neutral because, while Mrs. Cardaci would face dislocation costs, the costs were no greater than in any other foreclosure sale. We agree that there are no special dislocation costs to consider here. But it is problematic that the Court did not then address the "practical undercompensation" Mrs. Cardaci might suffer in the event of a forced sale.

The Supreme Court recognized in *Rodgers* that "financial compensation may not always be a completely adequate substitute for a roof over one's head." *Id.* at 704. That is particularly true when the market value of the property in question "would be less than the price demanded by the market for a lifetime's interest in an equivalent home." *Id.* And, because any calculation of the cash value of a survivorship interest "must of necessity be based on actuarial statistics," it "will unavoidably undercompensate persons who end up living longer than the average." *Id.* Therefore, to the extent that a forced sale of the entire property undercompensates the non-liable spouse for the value of her life estate and the potential that she lives longer than expected, this factor will weigh against a forced sale. How strongly this factor weighs against a forced sale, however, will depend on how great the risk of undercompensation is, given the particular circumstances.

In order to determine whether an innocent spouse will be adequately compensated by a fair distribution of the proceeds from a forced sale, a court must first determine the amount that the spouse would receive from such a sale. Although the District Court here did not consider the practical undercompensation to Mrs. Cardaci, it did determine the

17

amount it thought she would receive from a sale because that calculation was also necessary to the fourth factor. It said Mrs. Cardaci's interest in the property was worth eighty-six percent of the property's market value, after adopting the mathematical reasoning proposed by the Cardacis. To recapitulate, the Court first recognized that the Cardacis' "survivorship rights are of equal value: 50 percent of the property." *Cardaci*, 2014 WL 7524981, at *12. It then, in effect, found Mrs. Cardaci's life estate to be worth seventy-two percent of the value of her interest in the property. Because Mrs. Cardaci has only a one-half interest in the property, that seventy-two percent was divided by two to get to thirty-six percent of the value of the whole property. Since Mrs. Cardaci also had a fifty percent interest in survivorship, the Court added that fifty percent to the thirty-six percent value of the life estate to find that she had an eighty-six percent total interest in the value of the property.[8] The Court

---

[8] One of the difficulties posed by the District Court's calculation was the decision to first value Mrs. Cardaci's interest in the home and to then add the value of a survivorship interest on top of that. In doing so, the District Court relied on the Supreme Court's statement that "interests in property, when sold separately, may be worth either significantly more or significantly less than the sum of their parts." *United States v. Cardaci*, No. CIV. 12-5402 (JBS), 2014 WL 7524981, at *12 (D.N.J. Aug. 21, 2014) (quoting *United States v. Rodgers*, 461 U.S. 677, 694 (1983)). But the fact that the monetary value of the various interests in the property may vary depending on whether they are sold together or separately does not mean that the relative values – the percentage of the whole – represented by each of those interests will, when combined, exceed 100 percent of the

18

did not include Mr. Cardaci's interest in a life estate in its calculations, saying only that, "[a]s to the nonliable spouse[, i.e., Mrs. Cardaci], there is an extinguishment of her valuable right of life tenancy in that home and her right to withhold consent to sale of her home, for which the [g]overnment owes just compensation as a taking." *Id.*; *see also id.* at \*14 ("[A] forced sale would extinguish property rights presently held by the non-liable spouse, for which she must be compensated.").

The government argues that, based on our decision in *Popky v. United States*, 419 F.3d 242 (3d Cir. 2005), the District Court should have determined that each spouse had a fifty percent interest in the home, without any consideration of their respective life expectancies and future interests in the home. The Cardacis oppose that method of calculation and

---

market value of the property. *See In re Pletz*, 221 F.3d 1114, 1118 (9th Cir. 2000) ("Because the Debtor and his wife each have an undivided life estate in the Property with a right of survivorship, the sum of their tenancy by the entirety interests must equal 100% of the value of the Property."). As an economic matter, the market value of a property should account for all interests in the home, including survivorship and life estate and present possessory interests. As we discuss herein, if the intrinsic value of the life estate to the nonliable spouse (i.e., the personal benefit of having a roof over one's head) is out of proportion to his or her interest in the market value of the home, then that is a matter to be treated as "practical undercompensation," *Rodgers*, 461 U.S. at 711, and considered in weighing the equities. It does not, however, mean that the life estate assumes a greater proportion of the value of the interests in the property.

19

instead defend the calculation of the District Court. Neither position is correct, but the District Court's overarching concern about Mrs. Cardaci being fully and fairly compensated is sound and should be weighed under the third factor.

Contrary to the government's argument, *Popky* is not controlling. In that case, the marital property at issue had already been liquidated. *Popky*, 419 F.3d at 243. We concluded that the interest of each spouse in the resulting cash was an equal fifty percent. *Id*. at 245. Even though the cash itself was still held by the spouses as entirety tenants under Pennsylvania law, *id.* at 243, there can be no life estate in cash as there can in real property.[9] As a result, there was no need to turn to actuarial tables. *Id.* at 245.

In this case, however, real property and a life estate interest in that property are indeed at stake. To simply apply

---

[9] The Sixth Circuit has relied on our decision in *Popky* to find that the same 50/50 rule applied to real property that had not yet been sold because the state law similarly provided for equal interests in marital assets. *United States v. Barr*, 617 F.3d 370, 373 (6th Cir. 2010). New Jersey laws likewise provides equal *rights* to property, but the value of a life estate and right to survivorship necessarily varies with age. Because we must now account for the varying values of those rights, the simple approach we used to divide cash in *Popky* is not viable outside the limited situation presented in that case. *Barr*, 617 F.3d at 379 (Batchelder, C.J., concurring in part and dissenting in part) (dissenting as to the adoption of *Popky* in the context of real property because "[t]he weight of federal law argues strongly against" a blanket 50/50 split).

the same 50/50 rule used for liquidated property held as cash would be to ignore a critical interest in the life estate, and controlling Supreme Court precedent. *Rodgers*, 461 U.S. at 704 (stating that "any calculation of the cash value of a homestead interest must of necessity be based on actuarial statistics"). The Cardacis were counting on being able to live in their home all of their lives, regardless of which spouse may outlive the other. The same could not be said for the Popkys, who were looking only at a stack of cash. *See id.* (recognizing "that in practical terms financial compensation may not always be a completely adequate substitute for a roof over one's head"). The *Popky* rule is thus inapplicable under these circumstances.

Although *Popky*'s simple 50/50 rule does not control, we cannot agree with the District Court's calculation of the Cardacis' respective interests in the marital home. In a tenancy by the entirety, each spouse has a concurrent interest in the present value of the property, in a life estate, and in a right of survivorship. *See Freda*, 570 A.2d at 413. But because both the probability of obtaining the property upon the death of one's spouse and the value of the life estate depend on life expectancy, any calculation of the cash value of those interests "must of necessity be based on actuarial statistics[.]" *Rodgers*, 461 U.S. at 704. That is a logical rule. To give one admittedly extreme example, it stands to reason that a healthy twenty-six-year-old wife would have a greater interest in a life estate than would her ailing eighty-nine-year-old husband. While each spouse would have the same rights to the home, the measurable property value that they would be likely to receive from the property is not the same. Therefore, a method of calculation is needed that takes into account each spouse's concurrent interest in the present value

21

and their varying interests in life estate and survivorship rights. *See Newman*, 359 A.2d at 477 ("[T]he purchaser at an execution sale under a judgment entered against a tenant by the entirety acquires the right of survivorship of the debtor spouse as well as the interest of the latter in the life estate for the joint lives of husband and wife.").

A fair approach must therefore rely on joint-life actuarial tables to reflect the interests of both spouses. *See In re Pletz*, 221 F.3d 1114, 1117-18 (9th Cir. 2000) (following the Fifth Circuit in adopting a rule that calculates respective interests in marital property using joint-life actuarial tables). Such an approach accounts for differences in anticipated life expectancies and ensures that the concurrent interests of both spouses are correctly calculated, rather than valuing the non-liable spouse's interest as if she possessed an exclusive life estate. *Id.* at 117 (citing *United States v. Molina*, 764 F.2d 1132, 1133 (5th Cir. 1985); *Harris v. United States*, 764 F.2d 1126, 1130 (5th Cir. 1985)). Furthermore, it avoids the dilemma created by the District Court's methodology, which resulted in a sum of the various interests that exceeded one hundred percent of the value of the property. *Cardaci*, 2014 WL 7524981, at *12 ("Mr. and Mrs. Cardaci own property interests that, combined, appear to be worth more than 100 percent of the property."). The use of joint-life actuarial tables should assist in calculating spouses' respective interests in a way that does justice to both the property owners and the government. And, if a non-liable spouse will be practically undercompensated after that method of calculation, that fact is an important but separate consideration for the Court to take into account.

### 4. The Relative Character and Value of the Non-Liable and Liable Interests in the Property

Under the fourth factor, "a court should consider the relative character and value of the non-liable and liable interests held in the property[.]" *Rodgers*, 461 U.S. at 711. If "the third party has no present possessory interest or fee interest in the property, there may be little reason not to allow the sale[.]" *Id.* "[O]n the other hand, [if] the third party not only has a possessory interest or fee interest, but that interest is worth 99% of the value of the property, then there might well be virtually no reason to allow the sale to proceed." *Id.* It is unlikely that, based on life expectancy, the relative character and value of the non-liable and liable interests would be dramatically different in a tenancy by the entirety, unless those life expectancies were also dramatically different. Instead, this factor will more probably come into play when the liable party owns only a relatively small fraction of the property. For example, if the liable party owned property inherited from a parent as a tenant in common with five other siblings, the relative value of the property would weigh against a forced sale. But if the liable party owned a mansion on the property while the siblings owned only the surrounding land, the character of the liable party's interest might then weigh in favor of a forced sale.

Unlike the siblings in our example, the Cardacis own approximately equivalent interests in the property, both in terms of the character and value of their interests. Therefore, the fourth factor seems neutral here. Once the Court calculates the relative interests in the property using a joint-

23

life actuarial table, it will be in a position to determine more precisely how this fourth factor weighs in the balance.

### 5. *Other Equitable Factors*

As previously noted, the Supreme Court warned in *Rodgers* that the four equitable factors it focused on are not an exhaustive list and should not be "used as a 'mechanical checklist' to the exclusion of common sense and consideration of special circumstances." *Id.* Despite that, the government argues it was improper for the District Court in this case to "consider the prejudice to taxpayer's long-term house guests [who] … paid no rent and contributed nothing to the carrying costs of the property or the household." (Opening Br. at 60.) By "house guests," the government is presumably referring to the Cardacis' son Garrett and his wife and three children. It is an odd label to hang on members of an immediate family, but we leave it to the District Court to decide how, if at all, the interests of Garrett's family should weigh in the mix.

### III. CONCLUSION

For the foregoing reasons, we confirm the District Court's authority to consider whether a forced sale of the Cardacis' marital property should be ordered, but we will vacate and remand for the Court to recalculate the respective interests in the marital property and to reconsider the balance of equities presented by this case.

24